[L.A. No. 31775. Aug. 23, 1984.]

HELEN YOST et al., Plaintiffs and Appellants, v.
RICHARD D. THOMAS, as Clerk, etc., Defendant and Respondent;
PARK PLAZA CORPORATION, Intervener and Respondent.

## COUNSEL

Francis Sarguis for Plaintiffs and Appellants.

Carter J. Stroud, City Attorney (Alameda), as Amicus Curiae on behalf of Plaintiffs and Appellants.

Schramm & Raddue and Frederick W. Clough for Defendant and Respondent.

Charles J. Post, City Attorney (Hermosa Beach), McCarthy, Bullis & Post, Roger C. Lyon, Jr., City Attorney (Grover City), and Ronald L. Johnson,

Chief Deputy City Attorney (San Diego), as Amici Curiae on behalf of Defendant and Respondent.

James W. Brown, Ian M. Guthrie, Mullen, McCaughey & Henzell and Cavalletto, Webster, Mullen & McCaughey for Intervener and Respondent.

## OPINION

KAUS, J.— The issue is whether the California Coastal Act (Coastal Act) (Pub. Resources Code, § 30000 et seq.) precludes a referendum on any local land use measure affecting the coastal zone which is adopted by a city council after the California Coastal Commission (Commission) has approved the city's land use plan. We conclude that the Coastal Act does not preclude the referendum.

Appellants, voters of the City of Santa Barbara, circulated a referendum petition in opposition to two resolutions and one ordinance adopted by the City Council of Santa Barbara.[1] ██ ██ ██ ██ Respondent Thomas, the city clerk, refused to process the petition on advice of the city attorney that the three actions of the city council were not subject to referendum.[2] Appellants filed a petition for mandate in the superior court, to compel the city clerk to process the petition. The trial court denied the writ on the ground that the proposed referendum would be legally invalid. This appeal followed.

---

[1]The referendum stated: "REFERENDUM PETITION PROTESTING Adoption of General Plan Amendment 2-81 and Specific Plan No. 1 for Park Plaza Project, and Rezoning an easterly portion of APN 17-010-37, to permit the commercial development of Park Plaza Hotel-Conference Center on East Cabrillo Boulevard at Punta Gorda Street, Santa Barbara, California. [¶] To THE CITY COUNCIL OF THE CITY OF SANTA BARBARA: [¶] Pursuant to California Elections Code Section 4051, we the undersigned registered qualified voters of the City of Santa Barbara, hereby present this petition protesting the adoption of the above measures. (If any provision of this Petition is deemed invalid, the remaining provisions shall remain in effect.) [¶] We request that these actions be entirely repealed by you, or be submitted to a vote of the people at a regular city election or at a special election as required by law. [¶] The voters want to decide: A giant hotel convention center with restaurants and shops along Cabrillo Boulevard would dominate East Beach, causing parking and traffic congestion, smog, water and policing problems, employee pressure on limited housing, and loss of mountain views."

[2]The issue of whether the city clerk exceeded his authority in deciding not to process the referendum has not been raised before us. However, as we stated in *Farley* v. *Healey* (1967) 67 Cal.2d 325, 327 [62 Cal.Rptr. 26, 431 P.2d 650]: "It is not [a city clerk's] function to determine whether a proposed [referendum] will be valid if enacted . . . . These questions may involve difficult legal issues that only a court can determine. The right to propose [referendum] measures cannot properly be impeded by a decision of a ministerial officer, even if supported by the advice of the city attorney, that the subject is not appropriate for submission to the voters."

The referendum petition—signed by 10,260 voters—involved 3 planning actions of the city council pertaining to a 32-acre undeveloped tract of coastal land commonly referred to as the "Southern Pacific property." Intervener and respondent Park Plaza Corporation proposes a hotel and conference center development to be built on this tract. The actions by the city council in effect authorized the development. They were: (1) Resolution No. 81-091, adopted July 28, 1981, amending the city's general plan; (2) Resolution No. 81-092, adopted July 28, 1981, adopting a specific plan of development which had previously been approved by the city planning commission; and (3) Ordinance No. 4115, adopted August 4, 1981, changing the zoning of the Southern Pacific property.

The trial court concluded that the three actions were not subject to referendum because the city council was acting administratively to implement a land use plan approved by the Commission. As will appear, we disagree. ▮▮▮ Although certain actions of a city council may be characterized as "administrative" and therefore not subject to referendum, not all land use decisions made after a coastal plan has been adopted and approved by the Commission fall into that category. The Coastal Act does not provide blanket immunity from the voters' referendum power.

I

The Coastal Act

The Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.)[3] was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people"; that "the permanent protection of the state's natural and scenic resources is a paramount concern"; that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state . . . ." (§ 30001, subds. (a) and (d)). "[T]he basic goals of the state for the coastal zone" are to: "(a) Protect, maintain, and, where feasible, enhance and restore the overall quality of the coastal zone environment and its natural and manmade resources. [¶] (b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state. [¶] (c) Maximize public

---

[3]All statutory references, unless otherwise indicated, are to the Public Resources Code. All statutory language is from those statutes in effect at the time of the trial court decision.

access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of property owners. [¶] (d) Assure priority for coastal-dependent and coastal-related development over other development on the coast. [¶] [and] (e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone." (§ 30001.5.)

A combination of local land use planning procedures and enforcement to achieve maximum responsiveness to local conditions, accountability, and public accessibility, as well as continued state coastal planning and management through a state coastal commission are relied upon to insure conformity with the provisions of the act (§ 30004, subds. (a) and (b)). Therefore, all local governments lying in whole or in part within the coastal zone had to prepare and submit to the Commission a local coastal plan (LCP) (§ 30500, subd. (a)). The LCP consists of a local government's "(a) land use plans, (b) zoning ordinances, (c) zoning district maps, and (d) within sensitive coastal resources areas, other implementing actions, . . ." (§ 30108.6.) The precise content of each LCP is determined by the local government in full consultation with the Commission (§ 30500, subd. (c)) and must meet the requirements of, and implement the provisions and policies of [the act] at the local level (§ 30108.6).

Sections 30200 et seq. set forth the specific policies which constitute the standards by which the adequacy of local coastal programs are to be determined (§ 30200). There are specific policies on public access to the sea and shorelines (§§ 30210-30214); recreational use (§§ 30220-30224); protection of the marine environment (§§ 30230-30236); protection of land resources (§ 30240 [environmentally sensitive habitats]; § 30241 [agricultural land]; § 30243 [timberlands]; § 30244 [archaeological resources]); development (§§ 30250-30255); and industrial development (§§ 30260-30264).

The LCP may be submitted to the Commission all at once or in two phases—a land use plan (LUP) and zoning ordinances, etc. (§ 30511). The Commission will certify a LUP "if it finds that a land use plan meets the requirements of, and is in conformity with, the policies of Chapter 3 (commencing with Section 30200) . . . ." (§ 30512, subd. (c).) "The commission shall require conformance with the policies and requirements of Chapter 3 . . . only to the extent necessary to achieve the basic goals [of the act]." (§ 30512.2.) The Commission may only reject zoning ordinances on the grounds that they do not conform, or are inadequate to carry out the provisions of the certified land use plan (§ 30513). A certified LCP and all local implementing ordinances may be amended by a local government, but

no such amendment shall take effect until it has been certified by the Commission (§ 30514). For the purposes of section 30514 an "amendment of a certified local coastal program" includes, but is not limited to, any action by the local government which authorizes a use of a parcel of land other than that designated in the LCP as a permitted use (§ 30514, subd. (d)).

II

Santa Barbara's Land Use Plan

In July 1977, the City of Santa Barbara began preparation of the LUP portion of its LCP. During the preparation of the LUP there were a number of hearings before the planning commission and public hearings before the city council. In September 1980 the LUP was adopted by the council. It was approved and certified by the Commission in January 1981.

The LUP sets forth the following policies relevant to the Southern Pacific (SP) property: "*Policy 4.1* [¶] In order to preserve and encourage visitor-serving commercial uses, appropriate areas along Cabrillo Boulevard . . . shall be designated 'Hotel and Related Commerce I (HRC-I)' and 'Hotel and Related Commerce II (HRC-II).' [¶] HRC-I designation shall include hotels, motels, other appropriate forms of visitor-serving overnight accommodations and ancillary commercial uses directly related to the operation of the hotel/motel. [¶] HRC-II designation shall include all uses allowed in HRC-I and such other visitor-serving uses examples such as, but not limited to, restaurants, cafes, art galleries, and commercial recreation establishments. Uses such as car rentals and gas stations will require a conditional use permit. [¶] . . . [¶] *Policy 4.6* [¶] The 'Southern Pacific Property' (that area roughly bounded by Milpas Street and Punta Gorda Street on the east, Cabrillo Boulevard on the south, the City parcel located at the approximate extension of Garden Street on the west, and the existing Southern Pacific Railroad right-of-way on the north) shall be designated for a mixture of visitor-serving uses and recreational opportunities and planned as an integral unit in order to minimize potential circulation, visual, and other environmental impacts. [¶] *Action* [¶] The City shall require the submittal of a specific plan for the area which would address the problems and opportunities related to the development of this property, including, but not limited to: [¶] (1) Traffic Circulation [¶] (2) Parking [¶] (3) Visual Impacts along Cabrillo Boulevard [¶] (4) Geologic Hazards [¶] (5) Recreational Opportunities [¶] (6) Visitor-Serving Uses [¶] (7) Mixed Uses Consisting of HRC-II and Residential [¶] At the time of review of the Specific Plan, the standards

of review shall include PRC Sections 30221 and 30222.[4] The City shall ensure that recreational and visitor-serving uses on the western portion of the property shall not be precluded by residential uses. The eastern portion of the property shall be designated exclusively for visitor-serving uses, HRC-I. The western portion shall include approximately 11 acres west of the extension of Salsipuedes Street. The eastern portion shall include approximately 23 acres east of the extension of Salsipuedes Street. [¶] Land uses located on private lands on the western portion of the property north and immediately adjacent to the strip of publicly owned land fronting on Cabrillo Boulevard shall be limited to open space and recreational uses abutted to the north by visitor-serving and/or mixed visitor-serving/residential uses. Residential uses on this portion of the area shall not predominate other priority Coastal Act uses."

The LUP also contained the following policy: *"Policy 3.6* [¶] The City of Santa Barbara shall consider expansion of both public parking and public open space at Palm Park north of the existing alignment of Cabrillo Boulevard." Although this policy appears to reflect a desire to keep the area north of Cabrillo Boulevard—an area which includes the SP property—as open space, as early as 1964 the city had contemplated permitting a hotel conference center to be built on the SP property. Therefore, in the recreational section of the LUP it was noted that "[t]he Palm Park area inland of Cabrillo Boulevard includes two vacant parcels of 29.58 and 2.27 acres in respective size. It is centrally located along Santa Barbara's waterfront area where the greatest demand for recreational and visitor-serving facilities appears to be concentrated. Because this is one of the last remaining parcels along Santa Barbara's waterfront, maintaining a balance of commercial visitor-serving uses and public recreational uses in keeping with the Santa Barbara character is important. The area is currently being considered for Hotel/Conference Center/Park/Condominium development."[5]

---

[4]Section 30221 provides: "Oceanfront land suitable for recreational use shall be protected for recreational use and development unless present and foreseeable future demand for public or commercial recreational activities that could be accommodated on the property is already adequately provided for in the area."

Section 30222 provides: "The use of private lands suitable for visitor-serving commercial recreational facilities designed to enhance public opportunities for coastal recreation shall have priority over private residential, general industrial, or general commercial development, but not over agriculture or coastal-dependent industry."

See also section 30210, which states: "In carrying out the requirement of Section 4 of Article X of the California Constitution, maximum access, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse."

[5]This seemingly was an attempt to explain the apparent conflict between the policies stated in Policy 3.6 (open space) and Policy 4.1 (hotel). The city claims that no conflict exists because policy 3.6 does not encompass the SP property. The city asserts it never intended

After the LUP was approved by the Commission, intervener and respondent Park Plaza Corporation filed applications with the city for: (1) a general plan amendment; (2) approval of a specific plan; (3) rezoning of the SP property; (4) approval of a tentative subdivision map; (5) parking modifications; and (6) approval of a hotel/conference center development plan for 23 acres of the SP property. Public hearings were held on these applications by the planning commission, after which the commission adopted resolutions recommending to the city council the adoption of the amendment to the general plan, the amendment to the zoning ordinance, and of the specific plan. The city council considered the recommendations at a public hearing and at the conclusion of the hearing approved the general plan amendment, the specific plan, the rezoning, a tentative subdivision map, the parking modification, and a development plan for a 360-room hotel with conference facilities.

The amendment to the general plan changed the circulation element of the general plan in order to reaffirm the existing alignment of Cabrillo Boulevard.[6] It also changed land use designations on the SP property.[7] The specific plan was a 14-page document covering the 23 acres to be developed, which addressed the problems related to the development of the area. The zoning ordinance changed the zoning of the property from R-1/M-1/C-2 to R-1/R-4.[8]

Whether the changes to the general plan and the applicable zoning, as well as the specific plan, are subject to referendum, is the crux of this litigation.

### III

### Discussion

■ The powers of referendum and initiative apply only to legislative acts by a local governing body (*Arnel Development Co.* v. *City of Costa*

---

to designate the property as open space. Whatever the merit of this claim, it is clear to us that the description of the Palm Park area north of Cabrillo Boulevard contained in the LUP, includes the SP property.

[6]The general plan had proposed an alignment of Cabrillo Boulevard to a more inland course; the LUP does not mention the location of Cabrillo Boulevard.

[7]Parcel A (23 acres) was changed from "Major Public and Institutional Uses—Park" with a secondary designation of "Hotel and Residential" to "Hotel and Residential." Parcels B and C (11 acres) were changed to add a secondary use of "Hotel and Residential" to "Major Public and Institutional Uses—Park."

[8]The R-4 zoning designation permits hotels, motels, multiple residence housing; the M-1 designation permits heavy industrial use and the C-2 designation permits commercial, retail use. The R-1 designation is open space.

*Mesa* (1980) 28 Cal.3d 511, 516, fn. 6 [169 Cal.Rptr. 904, 620 P.2d 565]). Acts of a local governing body which, in a purely local context, would otherwise be legislative and subject to referendum may, however, become administrative "in a situation in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 596, fn. 14 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038]; see *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550 [219 P.2d 457]). Respondents contend that the actions taken by the city council were administrative in nature by virtue of the fact that the council was acting under the authority delegated by the state to implement state coastal land use policies—that, in effect, the Coastal Act preempts the exercise of the power of referendum.

■ Absent the Coastal Act the actions taken by the city council are clearly legislative. The adoption of a general plan is a legislative act (*O'Loane* v. *O'Rourke* (1965) 231 Cal.App.2d 774 [42 Cal.Rptr. 283]). "The amendment of a legislative act is itself a legislative act" (*Johnston* v. *City of Claremont* (1958) 49 Cal.2d 826, 835 [323 P.2d 71]) and the amendment of a general plan is thus a legislative act subject to referendum. (See *Duran* v. *Cassidy* (1972) 28 Cal.App.3d 574, 583 [104 Cal.Rptr. 793].) Therefore, the amendments to Santa Barbara's general plan were legislative acts normally subject to referendum.

■ Similarly, the rezoning of land is a legislative act (*Arnel Development Co.* v. *City of Costa Mesa, supra,* 28 Cal.3d 511) subject to referendum (*Johnston* v. *City of Claremont, supra,* 49 Cal.2d 826; *Dwyer* v. *City Council* (1927) 200 Cal. 505 [253 P. 932]).

■ This leaves the question whether the adoption of a specific plan is to be characterized as a legislative act. We have no doubt that the answer is affirmative. Certainly such action is neither administrative nor adjudicative. (Cf. *Arnel Development Co.* v. *City of Costa Mesa, supra,* 28 Cal.3d at p. 523; *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 613 [156 Cal.Rptr. 718, 596 P.2d 1134].) On the other hand the elements of a specific plan are similar to those found in general plans or in zoning regulations— the siting of buildings, uses and roadways; height, bulk and setback limitations; population and building densities; open space allocation (Gov. Code, § 65451). The statutory procedure for the adoption and amendment of specific plans is substantially similar to that for general plans (see Gov. Code, § 65507). It appears therefore that the legislative aspects of a specific plan are similar to those of general plans. We find support for this decision in *Wheelright* v. *County of Marin* (1970) 2 Cal.3d 448, 457 [85 Cal.Rptr. 809, 467 P.2d 537] (adoption of a "precise" plan is a legislative act) and

hold that the adoption of a specific plan by the city council was a legislative act subject to referendum.

Interveners and respondents assert, however, that these normally legislative acts become administrative by virtue of the fact that the Coastal Act establishes a pervasive system of state regulation over a matter of state concern which precludes local referenda on the implementing actions of local governments. The argument is that since the SP property lies in the territory defined as the California coastal zone, and since the Coastal Act requires local governments in the coastal zone to develop local LUPs (§ 30500, subd. (a)) which are acceptable to the Commission as conforming with the development and conservation policies of the Coastal Act (§§ 30200-30264), the city council thereafter becomes an agency of the state in enacting all subsequent land use policies in the coastal zone. This analysis is far too simplistic.

The Coastal Act of 1976 was the result of popular recognition that uncontrolled development of the California coastline could not continue. The act sets forth a statement of policies (§§ 30200-30264) which are binding on local and state agencies in planning further development in the coastal zone. As noted, important sections of the act provide for a coastal access program, developmental controls, and identification of sensitive coastal resource areas (§ 30502). Further, it contains various administrative provisions. (E.g. §§ 30512-30523.) There is no doubt that the Coastal Act is an attempt to deal with coastal land use on a statewide basis. ■ Nor is it disputed that in matters of general statewide concern the state may preempt local regulation (*Associated Home Builders etc., Inc.* v. *City of Livermore, supra,* 18 Cal.3d 582, 596, fn. 14). However, state regulation of a matter does not necessarily preempt the power of local voters to act through initiative and/or referendum (see *Hughes* v. *City of Lincoln* (1965) 232 Cal.App.2d 741, 745 [43 Cal.Rptr. 306]; *Norlund* v. *Thorpe* (1973) 34 Cal.App.3d 672, 675 [110 Cal.Rptr. 246]). ■ The question, therefore, is whether the Legislature intended to preempt local planning authority and thereby preempt the power of the voters to act through referendum.

Certainly the act does not explicitly claim to preempt local planning authority, nor does it specifically refer to the referendum and initiative powers. The intent of the Legislature must therefore be implied from the general provisions of the act.

Section 30500, subdivision (a), previously noted, provides that: "Each local government lying, in whole or in part within the coastal zone shall prepare a local coastal program for that portion of the coastal zone within its jurisdiction." Section 30500, subdivision (c) makes it clear that: "The

precise content of each local coastal program shall be determined by the local government, consistent with Section 30501, in full consultation with the commission . . . ." "The commission shall certify a land use plan, or any amendments thereto, if such commission finds that a land use plan meets the requirements of, and is in conformity with, the policies of Chapter 3 (commencing with Section 30200) . . . ." (§ 30512, subd. (c).) "The commission's review of a land use plan shall be limited to its administrative determination that the land use plan . . . does, or does not, conform with the [policies of the act] . . . the commission is not authorized by any provision of this division to diminish or abridge the authority of a local government to adopt and establish, by ordinance, the precise content of its land use plan" (§ 30512.2, subd. (a)). "The commission may only reject zoning ordinances, zoning district maps, or other implementing actions on the grounds that they do not conform with, or are inadequate to carry out, the provisions of the certified land use plan." (§ 30513.) The wording of these and other sections does not suggest preemption of local planning by the state, rather they point to local discretion and autonomy in planning subject to review for conformity to statewide standards. ■ As was noted in *City of Chula Vista* v. *Superior Court* (1982) 133 Cal.App.3d 472, 488 [183 Cal.Rptr. 909], "the Commission in approving or disapproving an LCP does not create or originate any land use rules and regulations. It can approve or disapprove but it cannot itself draft any part of the coastal plan."

■ The discretion accorded local governments in establishing, creating and implementing land use plans is most clearly reflected in the language of section 30005. "No provision of this division is a limitation on any of the following: [¶] (a) Except as otherwise limited by state law, on the power of a city or county or city and county to adopt and enforce additional regulations, not in conflict with this act, imposing further conditions, restrictions, or limitations with respect to any land or water use or other activity which might adversely affect the resources of the coastal zone." (§ 30005, subd. (a).)

■ Under the act, local governments, therefore, have discretion to zone one piece of land to fit any of the acceptable uses under the policies of the act, but they also have the discretion to be more restrictive than the act. The Coastal Act sets minimum standards and policies with which local governments within the coastal zone must comply; it does not mandate the action to be taken by a local government in implementing local land use controls. ■ ■ The Commission performs a judicial function when it reviews a local government's LCP—it determines whether the LCP meets the minimum standards of the act (*City of Chula Vista* v. *Superior Court, supra*, 133 Cal.App.3d 472, 488), but once an LCP has been approved by the Commission, a local government has discretion to choose what action

to take to implement its LCP: it can decide to be more restrictive with respect to any parcel of land, provided such restrictions do not conflict with the act.[9]

The act, therefore, leaves wide discretion to a local government not only to determine the contents of its land use plans, but to choose how to implement these plans. Under such circumstances a city is acting legislatively and its actions are subject to the normal referendum procedure.

We are not persuaded by respondents' assertion that the discretion left to local governments by the act is not significant and that far more discretion was present in *Simpson* v. *Hite* (1950) 36 Cal.2d 125 [222 P.2d 225] where we held that a city's selection of a site for a court house pursuant to a declared legislative policy was not a legislative act. This argument fails to acknowledge that the *only* discretion left to the local government by the Legislature in *Simpson* was the choice of a site for a municipal and superior court. The board of supervisors had a duty to provide suitable quarters for the courts; they could not choose whether to construct a county hall of administration instead—or a new jail, a park or museum.

No such tightly circumscribed duty is imposed on local governments by the Coastal Act. The act does not dictate that a local government must build a hotel and conference center—that decision is made by the local government. It merely requires local governments to comply with specific policies—but the decision of whether to build a hotel or whether to designate an area for a park remains with the local government. A local government is acting legislatively in making this decision as well as in implementing it.

Finally we confront respondents' contention that the initiative and referendum processes are ill-suited to the careful preparation and implementation of an LCP in conformity with the policies of the act—that an alternative program imposed by the initiative process would lack the "full consultation with the commission" required by section 30500, subdivision (c), and that the referendum process could be used by local electors to frustrate any attempt by the governing body to comply with the Coastal Act.

As far as the argument based on the unsuitability of the initiative is concerned, it simply does not apply here because we are concerned with a referendum. (But see *Associated Home Builders etc. Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 595-596 [135 Cal.Rptr. 41, 557 P.2d 473, 92

---

[9]A local government can amend a certified LCP or LUP (§ 30514). An amendment which authorizes a use designated as a permitted use in the LCP does not require certification by the Commission; an amendment which authorizes a use other than that designated in the LCP as a permitted use does require certification by the Commission (§ 30514, subd. (d)).

A.L.R.3d 1038].) The referendum under consideration merely seeks to undo a specific implementation of the LUP envisaged by the Santa Barbara City Council. True, if down the road the people exercise their referendum power in such a way as to frustrate any feasible implementation of the LUP, some way out of the impasse will have to be found. At this point, however, the system is not being put to so severe a test.

## IV

## Conclusion

We conclude that the Coastal Act does not transform the exercise of legislative power into administrative action by virtue of a Commission certification of a land use plan. The Legislature left wide discretion to local governments to formulate land use plans for the coastal zone and it also left wide discretion to local governments to determine how to implement certified LCPs. Under such circumstances, the City Council of Santa Barbara was acting legislatively when it adopted the two resolutions and the ordinance which are the subject of this appeal. Its action is thus subject to the normal referendum procedure.

The judgment is reversed and the case is remanded to the trial court with directions to issue a peremptory writ of mandate ordering respondents to place the proposed referendum on the ballot for municipal election, provided there has been compliance with the formal filing requirements.

Bird, C. J., Mosk, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.