Filed 6/21/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PARK AT CROSS CREEK, LLC, et al., <br><br>    Plaintiffs and Respondents, <br><br>    v. <br><br> CITY OF MALIBU, <br><br>    Defendant and Appellant; <br><br> DRU ANN DIXON-JACOBSON et al., <br><br>    Interveners and Appellants. | B271620, B275311 <br><br> (Los Angeles County <br> Super. Ct. No. BS155299) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James Chalfant, Judge.  Affirmed.

Jenkins & Hogin, Christi Hogin and Gregg W. Kettles, City Attorneys, for Defendant and Appellant.

Hueston Hennigan, Marshall A. Camp, Padraic W. Foran and Leanne O. Vanecek for Plaintiffs and Respondents.

Remcho, Johansen & Purcell, Robin B. Johansen, James C. Harrison, Thomas A. Willis and Margaret R. Prinzing for Interveners and Appellants.

_____

In November 2014, the voters of Malibu enacted Measure R, an initiative designed to limit large developments and chain establishments. The Park at Cross Creek, LLC (The Park) and Malibu Bay Company (Malibu Bay), both of which were developing projects in Malibu, petitioned the trial court to have Measure R declared invalid. The court granted that petition. Appellants the City of Malibu and interveners Dru Ann Dixon-Jacobsen, Carol Moss and Michele Reiner (the official proponents of Measure R) appeal.[1] We conclude that Measure R exceeds the initiative power and is illegal. We therefore affirm the judgment.

## BACKGROUND[2]

### I.    Malibu voters pass Measure R

On November 4, 2014, Malibu voters approved Measure R, an initiative entitled, "Your Malibu, Your Decision Act." Measure R seeks to preserve Malibu's "unique small-town, rural character" and to "protect natural resources by adopting provisions that will ensure our community remains a unique oasis in the midst of

_____

[1]    Unless otherwise specified, we refer to appellants collectively as "the City."

[2]    The interveners ask us to take judicial notice of excerpts from Malibu's general plan, the official statements of votes cast for Measure R and for Measure W (a separate measure to approve a specific plan for Whole Foods), and minutes from a July 20, 2015 city council special meeting. We take judicial notice of Malibu's general plan (Evid. Code, § 452, subds. (b) & (c)) but deny the request as to the remaining items.

2

urban and suburban sprawl and generic development while at the same time ensure our City evolves in a sustainable manner that meets the needs of our residents and visitors." (Your Malibu, Your Decision Initiative, Preamble, §§ 2(1), (3)(1) (Preamble).)

To those ends, Measure R has two primary components designed to limit large developments and "formula retail establishments," i.e., chain stores. Measure R first requires Malibu's City Council to prepare a specific plan for every proposed commercial or mixed-use development in excess of 20,000 square feet for the commercial area. (Malibu Mun. Code, ch. 17.02, § 17.02.045, subds. (B)(2) & (C)(1).)[3] The specific plan must comply with Malibu's general plan and local coastal program and must address: floor area; requirements "to ensure the retention of retail businesses serving local residents and visitors"; preserving important view corridors and vistas; traffic; public facilities, services, and economic analysis; open space; parking; enlargement of the commercial area; and geological, hydroelectrical and wastewater impacts. (*Id*., subd. (C)(3).) In addition to preparing a specific plan, the city council must prepare a report with full notice and public hearing. (*Id*., subds. (C)(3) & (D).)

Following the city council's approval of a specific plan, the plan must be placed on the ballot for voter approval. (§ 17.02.045, subd. (C)(1).) Until the voters approve a specific plan, the city "shall take no final action on any discretionary

---

[3]    Measure R amends Malibu's Municipal Code. All further undesignated statutory section references are to Chapter 17.02 or Chapter 17.66 of that code.

3

approval relating to" the proposed development.  (*Id.*, subd. (E).)
" 'Discretionary approval' " means any discretionary land use
entitlement or permit "of any type whatsoever" issued by Malibu.
(*Id.*, subd. (B)(5).)  Following voter approval of a specific plan,
under "no circumstances shall any subsequent permit or approval
issued by any city department or official authorize, allow, or
otherwise approve higher square footage, density, or intensities
of uses, or less landscaping, open space, or mitigation
requirements, including traffic mitigation and safety
requirements, than were finally approved by the voters." (*Id.*,
subd. (F).)

To further prevent Malibu from becoming "Anything Mall,
USA," Measure R's second component restricts formula retail
establishments, defined as an establishment having 10 or more
retail establishments in the world and maintaining two or more
of the following features:  standardized array of merchandise or
menu; standardized color scheme; standardized decor, façade,
layout or signage; a servicemark or a trademark; "and" uniform
apparel.  (§ 17.66.130, subd. (E).)  Chains may not exceed 2,500
square feet and may not occupy more than 30 percent of a
shopping center's square footage or leasable tenant spaces per
floor.  (*Id.*, subd. (B)(4), (5).)  These limits apply to new chain
establishments and to existing ones wanting to relocate, expand
by 200 or more square feet, or increase service area by 50 or more
square feet.  (*Id.*, subd. (A).)

Formula retail establishments also must obtain a
conditional use permit (CUP).[4]  To approve a CUP, the planning

---

[4]    Existing formula retail establishments are exempted from
the CUP requirement when they change ownership.  Certain
formula retail establishments are also exempt; for example,

4

commission, in lieu of the findings required in section 17.66.080,[5] shall find that the proposed formula retail establishment complies with the size and occupancy limitations, "will not impair the city's unique, small-town community character by promoting a predominant sense of familiarity or sameness, with consideration for all existing formula retail establishments," and will promote a diverse commercial base. (§ 17.66.130, subd. (B)(2), (3).) Approved CUPs "shall run solely with the operation of the formula retail establishment for which it was approved and continue to be valid upon change of ownership of the formula retail establishment, the land, or any lawfully existing building or structure on the land." (*Id.*, subd. (D).)

## II.    Proposed developments in Malibu

The Park owns property at 23401 Civic Center Way in Malibu. Since 2009, The Park has invested $11.4 million to develop a Whole Foods project, which will include a 38,424 square foot shopping center comprised of a 24,549 square foot store, four smaller retail spaces, outdoor dining, a parking area, green walls, new trees, a park and playground for children, a community education garden, and a public gathering space in case of wildfire. The proposed Whole Foods store will occupy more than 30 percent of the center's square footage. In 2011, The Park's application to develop the project was approved. An

---

grocery stores, pharmacies, gas stations, banks, real estate offices, movie theatres, post offices, medical offices, and low-cost overnight accommodations. (§ 17.66.130, subd. (C).) Exempt businesses remain subject to the 30 percent restrictions.

[5]    Section 17.66.080 concerns the proposed use of a property.

environmental impact report was prepared, received public comment and awaits public hearings.

Malibu Bay owns property at 23575 Civic Center Way. Since 2012, it has invested $6.6 million to develop Malibu Sycamore Village, a mixed-use commercial project. One development plan includes office, retail, and restaurant establishments; community gathering spaces; and a children's play area. A second development plan includes a 5,000 square foot urgent care center.

### III.    The Park's and Malibu Bay's petition for a writ of mandate

In May 2015, The Park and Malibu Bay filed a verified petition for a peremptory writ of mandate to have Measure R declared facially invalid on the grounds, among others, it subjects administrative acts to public vote, creates an illegal CUP, and violates their substantive due process rights.[6] The Park and Malibu Bay and the City of Malibu stipulated to have the petition resolved on cross-motions for judgment on the pleadings.

The trial court held that Measure R's specific plan and voter approval requirements exceeded the scope of the initiative power and violated substantive due process. The court also held that Measure R created an illegal CUP that was "establishment-specific" and did not run with the land. The court thus declared Measure R facially invalid and enjoined Malibu from enforcing it. Thereafter, the court allowed the official proponents of Measure R to intervene but denied their request for a stay pending appeal.

---

[6]    Petitioners previously filed an action in federal court, but the federal court stayed their federal claims and dismissed their state law causes of action so that the state causes of action could be resolved in state court.

6

We, however, granted the interveners' petition for writ of supersedeas, thereby staying the lower court's judgment.

## STANDARD OF REVIEW

Our review is de novo. (*So v. Shin* (2013) 212 Cal.App.4th 652, 662 [review from motion for judgment on the pleadings]; *Citizens for Planning Responsibly v. County of San Luis Obispo* (2009) 176 Cal.App.4th 357, 366 [construing initiative's language is subject to de novo review].) Notwithstanding the de novo standard of review, we are also bound by " 'the long-established rule of according extraordinarily broad deference to the electorate's power to enact laws by initiative. The state constitutional right of initiative or referendum is "one of the most precious rights of our democratic process." [Citation.] These powers are reserved to the people, not granted to them. Thus, it is our duty to " ' "jealously guard" ' " these powers and construe the relevant constitutional provisions liberally in favor of the people's right to exercise the powers of initiative and referendum. [Citation.] An initiative measure " 'must be upheld unless [its] unconstitutionality clearly, positively, and unmistakably appears.' " [Citation.]' " (*Citizens for Planning Responsibly*, at p. 366.) And where, as here, a facial challenge is mounted to the constitutional validity of an initiative we consider only the text of the measure itself, not its application to the particular circumstances of an individual. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.)

## DISCUSSION

### I.    Measure R's specific plan requirement

California's Constitution guarantees the local electorate's right to initiative and referendum, and that right is generally coextensive with the local governing body's legislative power.

7

(*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775 (*DeVita*);
Cal. Const., art. II, § 11.)  The electorate has the power to initiate
legislative acts but not administrative or adjudicatory ones.
(*Yost v. Thomas* (1984) 36 Cal.3d 561, 569; *Citizens for Jobs & the
Economy v. County of Orange* (2002) 94 Cal.App.4th 1311, 1332
(*Citizens for Jobs & the Economy*); *City of San Diego v. Dunkl*
(2001) 86 Cal.App.4th 384, 399.)  Initiatives that lodge
adjudicatory powers in the electorate are invalid.  (*Wiltshire v.
Superior Court* (1985) 172 Cal.App.3d 296, 304 (*Wiltshire*).)  The
rationale for this rule "is that to allow the referendum or
initiative to be invoked to annul or delay the executive or
administrative conduct would destroy the efficient administration
of the business affairs of a city or municipality."  (*Lincoln
Property Co. No. 41, Inc. v. Law* (1975) 45 Cal.App.3d 230, 234.)

To determine whether an initiative enacts legislation, "it is
the substance, not the form that controls."  (*Marblehead v. City of
San Clemente* (1991) 226 Cal.App.3d 1504, 1509.)  The test to
distinguish a legislative act from an executive or administrative
one is well-established:  " ' " 'The power to be exercised is
legislative in its nature if it prescribes a new policy or plan;
whereas, it is administrative in its nature if it merely pursues a
plan already adopted by the legislative body itself, or some power
superior to it.' " '  [Citation]; . . . "Acts constituting a declaration
of public purpose, and making provisions for ways and means of
its accomplishment, may be generally classified as calling for the
exercise of legislative power.  Acts which are to be deemed as acts
of administration, and classed among those governmental powers
properly assigned to the executive department, are those which
are necessary to be done to carry out legislative policies and
purposes already declared by the legislative body, or such as are

devolved upon it by the organic law of its existence." [Citations.]' " (*City of San Diego v. Dunkl*, *supra*, 86 Cal.App.4th at pp. 399-400, italics omitted.)

In the land use context, legislative acts are distinguished from administrative or adjudicative ones on a categorical basis. (*Citizens for Planning Responsibly v. County of San Luis Obispo*, *supra*, 176 Cal.App.4th at p. 367.) Zoning ordinances, for example, are legislative acts: variances, CUPs, and subdivision map approvals are adjudicative acts. (*Ibid.*; *W. W. Dean & Associates v. City of South San Francisco* (1987) 190 Cal.App.3d 1368, 1375; *Arnel Development Co. v. City of Costa Mesa* (1980) 28 Cal.3d 511.) A city's or county's adoption of a general plan for its physical development is a legislative act. (*Yost v. Thomas*, *supra*, 36 Cal.3d at p. 570; *DeVita*, *supra*, 9 Cal.4th at p. 773; Gov. Code, § 65300.)[7] Adoption or amendment of a specific plan for the systematic implementation of the general plan is also a legislative act.[8] (*Yost*, at p. 570; *Dana Point*, *supra*, 52 Cal.App.4th at p. 481; see Gov. Code, §§ 65450, 65453.)

---

[7] A general plan is a comprehensive, long term plan for a city's physical development. (Gov. Code, § 65300.) A general plan shall include seven elements: land use, circulation and infrastructure, housing, conservation, open space and recreation, noise, and safety and health. (Gov. Code, §§ 65300, 65302.)

[8] " 'Among other things, a specific plan must contain standards and criteria by which development will proceed, and a program of implementation including regulations, programs, public works projects, and financing measures.' " (*Chandis Securities Co. v. City of Dana Point* (1996) 52 Cal.App.4th 475, 481 (*Dana Point*).) "A specific plan may be as general as setting forth broad policy concepts, or as detailed as providing direction to every facet of development from the type, location and

9

Because Measure R concerns specific plans and voter approval of them, the City argues that the measure is a legislative act and therefore does not exceed the initiative power. The City relies on cases holding that adoption of a specific plan is a legislative act. In *Dana Point*, for example, a city council approved a specific plan for developing the Headlands, 120 acres of land along the coast. (*Dana Point*, *supra*, 52 Cal.App.4th at pp. 479-480.) By referendum, the voters rejected the specific plan, as well as an amendment to the general plan. Because adoption or amendment of a general or specific plan is a legislative act, *Dana Point* held that the specific plan was subject to the electorate's referendum power. (*Id.* at p. 481; see also *Yost v. Thomas*, *supra*, 36 Cal.3d 561 [city council's approval of specific plan for hotel and conference center was legislative act subject to voter referendum].)

The City extrapolates from these authorities the notion its voters may require the city council to prepare a specific plan for every development project within Measure R's scope and to put that plan on the ballot for voter approval. In essence, the City cites *Yost* and *Dana Point* to ask why can't the electorate require every project to be reduced to a specific plan that is subject to voter approval? This, however, goes beyond the holdings of *Yost* and *Dana Point*. As the trial court below aptly said: "It is one thing for voters to challenge a specific plan by petition and

intensity of uses to the design and capacity of infrastructure; from the resources used to finance public improvements to the design guidelines of a subdivision." (Governor's Off. of Planning & Research, *The Planner's Guide to Specific Plans* (Jan. 2001) p. 4.) The plan may encompass a large area or just a single acre. (*Ibid.*)

10

referendum (*Yost*, *Dana Point*) or for voters to approve a general plan amendment by initiative which is then challenged by mandamus," "but it is another for voters to pass an initiative to compel a city to submit each commercial project for voter approval by means of a specific plan. The former are permissible, but the latter restricts [Malibu's] administrative discretion and places it firmly within the category of voter enactments of administrative matters, which are not permitted."

We agree. There is a difference between, on the one hand, voter approval of a specific plan and, on the other, *requiring* a city council to prepare a specific plan and report, to hold a public hearing about the specific plan and report, and then requiring the plan to be submitted to voters for approval. The former is a legislative act; the latter is an adjudicative one. Measure R, however, conflates the two under the guise of setting "policy," that "policy" being all development projects greater than 20,000 square feet must have a specific plan approved by voters.

But, in substance, this is not legislative policy. Measure R is not comparable to, for example, the general plan amendment in *Citizens for Planning Responsibly v. County of San Luis Obispo*, *supra*, 176 Cal.App.4th 357, or the voter approval requirement in *DeVita*, *supra*, 9 Cal.4th 763. In *Citizens for Planning Responsibly*, San Luis Obispo voters approved Measure J, which, via amendment to the county's general plan and a zoning ordinance, allowed a mixed-use development of a 131-acre property. The measure amended a zoning ordinance to set standards for, among other things, maximum densities, building heights, and floor area ratios; parking requirements; minimum and maximum building size and configurations; setback requirements; and permitted uses for the property. (*Citizens for*

11

*Planning Responsibly*, at p. 365; see generally *Yost v. Thomas*, *supra*, 36 Cal.3d 561; *Pala Band of Mission Indians v. Board of Supervisors* (1997) 54 Cal.App.4th 565.)  In contrast to *Citizens for Planning Responsibly*, Measure R doesn't prescribe similar policy for developments in excess of 20,000 square feet.  It does not, for example, set standards about building height, size or configuration.  Measure R instead requires specific plans to be prepared containing such details and to be submitted to the electorate.  The problem is not that specific plans include these details; indeed, specific plans must include some level of detail.[9] The problem is Measure R requires details to be in specific plans that are voter-approved but sets no substantive policy or standards for those plans.

---

[9]     Government Code section 65451 provides:

"(a)  A specific plan shall include a text and a diagram or diagrams which specify all of the following in detail:  [¶]  (1)  The distribution, location, and extent of the uses of land, including open space, within the area covered by the plan.  [¶]  (2)  The proposed distribution, location, and extent and intensity of major components of public and private transportation, sewage, water, drainage, solid waste disposal, energy, and other essential facilities proposed to be located within the area covered by the plan and needed to support the land uses described in the plan.  [¶]  (3)  Standards and criteria by which development will proceed, and standards for the conservation, development, and utilization of natural resources, where applicable.  [¶]  (4)  A program of implementation measures including regulations, programs, public works projects, and financing measures necessary to carry out paragraphs (1), (2), and (3).

"(b)  The specific plan shall include a statement of the relationship of the specific plan to the general plan."

Nor is Measure R's voter approval requirement comparable to the voter approval provision in *DeVita*, *supra*, 9 Cal.4th 763. Napa passed its Measure J, which provided that the land-use designations it enacted could be changed only by a majority vote of the county electorate. (*Id.* at p. 796.) Elections Code section 9125, however, already provided that initiative measures could not be repealed or amended "except by a vote of the people, unless provision is otherwise made in the original [initiative] ordinance." Thus, Measure J merely "formalize[d] the voter approval requirement implied" by the Elections Code. (*Id.* at p. 796.) Measure R, however, does not merely formalize any existing power of the electorate. It creates a new power—the requirement of a specific plan—and subjects it to voter approval. In this respect, Measure R limits Malibu's governing body from carrying out its duties pursuant to its police power. And, as *DeVita* suggests, such a limitation may be an unconstitutional attempt to amend the charter or create a charter-like provision in a city or county that does not possess one. (*Id.* at p. 798; see Cal. Const., art. XI, § 7 [a "county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws"].)

What Measure R thus does is closer to the prohibited administrative actions in *Wiltshire*, *supra*, 172 Cal.App.3d 296 and *Citizens for Jobs & the Economy*, *supra*, 94 Cal.App.4th 1311. In *Wiltshire*, San Diego County had a solid waste management plan for four projects, including one in North County. (*Wiltshire*, at p. 300.) The city council adopted a zoning ordinance requiring all solid waste management facilities to obtain a special-use permit. (*Id.* at p. 303.) The city council issued a special-use permit authorizing construction of the North County project. In

13

an effort to halt the project, Wiltshire circulated for signature an initiative requiring voter approval of the location, construction or establishment of waste-to-energy plants.  (*Id.* at pp. 299, 301, 302.)  *Wiltshire* held that the initiative impermissibly withdrew "from the San Marcos City Council the power to issue a special use permit in compliance with its zoning ordinance and requires a two-thirds electorate vote to approve the issuance of a special use permit in each instance."  (*Id.* at p. 303.)

Measure R similarly withdraws from Malibu's City Council the ability to issue discretionary land use entitlements or permits concerning a development project—unless and until voters approve a specific plan for that project.  (§ 17.02.045, subds. (B)(5) & (E).)  In this respect, Measure R is really about project-by-project review—which would otherwise be subject to administrative, not voter, approval— in the guise of a specific plan.  On its face, Measure R makes this clear.  Its stated purpose and intent is to require "preparation and voter approval of specific plans for large commercial or mixed-use *projects . . . .*" (Preamble, *supra*, § 3, italics added.)  " '*Development project* subject to this measure' shall mean any project for which a discretionary approval is sought in the commercial area, regardless of the number of parcels or parcel size, . . ." in excess of 20,000 square feet.  (§ 17.02.045, subd. (B)(2), italics added.)  The measure's voter approval provisions require a specific plan for every " '*development project* subject to this measure' " and, until voters approve a specific plan, Malibu is forbidden from taking any "discretionary approval relating to any *development project* subject to this measure."  (*Id.*, subds. (B)(2), (E), italics added.)  Measure R requires the voter ballot measure to clearly identify and accurately describe the "*development project*" to avoid

14

misleading the voters about "*project* definition, scope, and location." (*Id.*, subd. (D), italics added.) The city must prepare a report, subject to a public hearing for "[e]ach specific plan" which must address, for example, floor area, projected traffic, public services, open spaces, and "adequacy of parking within the *development project.*" (*Id.*, subd. (C)(3) & (C)(3)(g), italics added.) These provisions underscore Measure R's attempt to usurp administrative authority.

Measure R not only withdraws administrative authority but it also adds "layers" to the administrative process. *Citizens for Jobs & the Economy* concerned a similar attempt to limit a local governing body's administrative powers. In that case, the voters passed Measure A, which authorized the County of Orange to proceed with planning the conversion of a former military air station to a civilian airport. (*Citizens for Jobs & the Economy*, *supra*, 94 Cal.App.4th at p. 1316.) Voters thereafter passed Measure F, which placed spending and procedural restrictions on the board of supervisors regarding the conversion process. Measure F thus impermissibly changed "the procedure and substance of the implementing decisions that were created" by the prior Measure A, thereby adding "layers of voter approval and hearing requirements to the implementing decisions anticipated" by that prior measure. (*Id.* at p. 1333.)

The City distinguishes *Citizens for Jobs & the Economy* by characterizing Measure R as merely ensuring the proper sequencing of events: planning before permitting. Rather than helping the City's case, this characterization emphasizes the administrative nature of Measure R. How the development process is "sequenced" is an administrative matter. Moreover, the intended effect of this "sequencing" is to withdraw from

15

Malibu's governing body its ability to administratively act *at all* until a specific plan and report are prepared for a development project, a hearing is held on the plan and report, and voters approve the plan. Even then, in the event of voter approval, Malibu's administrative functions are curtailed, because under "no circumstances shall any subsequent permit or approval issued by any city department or official authorize, allow, or otherwise approve higher square footage, density, or intensities of uses, or less landscaping, open space, or mitigation requirements, including traffic mitigation and safety requirements, than were finally approved by the voters." (§ 17.02.045, subd. (F).) Measure R thus invalidly annuls or delays executive or administrative conduct. (*Lincoln Property Co. No. 41, Inc. v. Law*, *supra*, 45 Cal.App.3d at p. 234.)

Finally, we find unpersuasive the City's supposition that a facial challenge to Measure R is improper because the project-by-project review it clearly contemplates may never come to pass. Instead, the city council could adopt a specific plan for the entire civic or commercial center, as opposed to a specific plan for a single project. True, Measure R allows a specific plan to cover more than one project. (§ 17.02.045, subd. (C)(1) ["One specific plan may be prepared covering more than one development project subject to this measure or a separate specific plan may be prepared for each subject project"].) But nothing in Measure R suggests that a specific plan for the entire civic center could be adopted. Rather, the clear and unambiguous intent of Measure R is to control development of projects in excess of 20,000 square feet.[10]

---

[10] Because we invalidate Measure R on the ground it exceeds the initiative power, we need not consider alternative arguments

16

## II. Legality of the CUP provisions

Measure R controls chain stores by requiring them to obtain a CUP.  (§ 17.66.130, subd. (A).)  But before a CUP may even be issued, Measure R requires the planning commission, in lieu of the findings in section 17.66.080 about a property's proposed use, to make findings about the specific chain.  Measure R then restricts transfer of the CUP:  "each approved [CUP] shall *run solely with the operation of the formula retail establishment for which it was approved* and continue to be valid upon change of ownership of the formula retail establishment, the land, or any lawfully existing building or structure on the land."  (§ 17.66.130, subd. (D), italics added.)  The meaning of these restrictions is undisputed:  the nature of the chain establishment is to be considered, and, once a chain, say Starbucks, obtains a CUP, the CUP can be transferred to another Starbucks but not to Peet's, notwithstanding that Starbucks and Peet's have the same "use," i.e., both are coffee shops.  Measure R CUPs thus are establishment-specific *and* restricted in their transferability.

These features of the CUP, however, are contrary to well-established principles.  "A conditional use permit is administrative permission for uses not allowed as a matter of right in a zone, but subject to approval."  (*Sounhein v. City of San Dimas* (1996) 47 Cal.App.4th 1181, 1187 (*Sounhein*).)  A CUP is not a personal interest.  It does not attach to the permittee; rather, a CUP creates a right that runs with the land.  (*Anza Parking Corp. v. City of Burlingame* (1987) 195 Cal.App.3d 855, 858 (*Anza*); see also *Malibu Mountains Recreation, Inc. v.*

---

about, for example, whether it also violates substantive due process.

17

*County of Los Angeles* (1998) 67 Cal.App.4th 359, 367; *Sounhein*, at p. 1187.) Otherwise, a condition regulates the person rather than the land, improperly turning a CUP into an "*ad hominem* privilege rather than a decision regulating the use of property." (*Anza*, at p. 859, citing *Vlahos v. Little Boar's Head District* (1958) 101 N.H. 460 [146 A.2d 257, 260].) A condition which relates solely to the individual or applicant for the CUP does not relate to the property's use and zoning. (*Sounhein*, at p. 1187.)

In *Anza*, for example, Anza had a CUP authorizing the use of land as a parking facility. The CUP was nontransferable, and Anza sought to enforce that condition to prevent the CUP's transfer to another parking corporation. The *Anza* court refused to enforce the nontransferability clause because a CUP "may *not* lawfully (and perhaps may *not constitutionally . . .*) be conditioned upon the permittee having no right to transfer it with the land." (*Anza, supra*, 195 Cal.App.3d at p. 860, third italics added.)

In *Sounhein*, San Dimas issued a CUP allowing the Sounheins to have a second residential unit on their property, but the CUP, pursuant to a Government Code provision, had an "owner-occupied" requirement, meaning that the Sounheins or any subsequent owner of the property had to reside at either the primary or the secondary residence. (*Sounhein, supra*, 47 Cal.App.4th at pp. 1186-1187.) The Sounheins challenged the owner-occupied requirement on the ground it applied *only* to the first property owner, i.e., the applicant-owner. (*Id.* at p. 1190.) The *Sounhein* court rejected this challenge because it, among other things, would have improperly conditioned issuance of a CUP on the nature of the applicant, rather than on the use of the property. (*Id.* at p. 1191.) "Thus, the issuance of a permit may be

18

conditioned on the character of the property as owner-occupied, but not on the character of an applicant as an owner-occupant." (*Ibid.*)

Here too Measure R's CUP, by defining Starbucks (staying with our hypothetical) as a "proposed use" and by requiring the land to be used *only* for a Starbucks, conditions the CUP on the character of the permittee or applicant rather than on the use of the land. The City suggests this is legal because a "particular chain store" is a "specific [land] use"; hence, there is no distinction between the "uses" of "McDonalds" and "Starbucks" and "the more general categories" of hamburger joints and coffee shops. But as much as one may believe that Starbucks and McDonalds and their ilk have become so ubiquitous as to constitute a generic land use, the City cites no authority to support such a proposition. Starbucks is not a land use. "Coffee shop" or restaurant is the land use.

Not only does Measure R's CUP depend on the notion that Starbucks is a proposed use, the CUP then "runs" with Starbucks, which is precisely what *Anza* and *Sounhein* held was improper. The City's response—that the CUP runs with the land because "anyone who acquires a CUP to operate a Starbucks may transfer that . . . Starbucks, the land beneath it, or the building that houses it"—is sophistry. True, if John gets a CUP to operate a Starbucks, he may transfer the CUP to Jane. But Jane must run a Starbucks. She may not run a Peet's. As the trial court recognized, Malibu's distinction is one "between a business and its ownership, not a distinction based on property use." Malibu's argument still boils down to allowing the CUP to be transferred only if a Starbucks continues to operate on the land—a distinction not grounded in the use of the land. (*Sounhein*, *supra*,

47 Cal.App.4th at p. 1187 [conditions of approval must relate to the property "and not to the particular applicant"].)

### III. Severability

Malibu argues that any invalid portions of Measure R may be severed. (Preamble, *supra*, § 16.)[11] A severability clause " ' "normally calls for sustaining the valid part of the enactment, especially when the invalid part is mechanically severable. . . ." ' . . . ' "[s]uch a clause plus the ability to mechanically sever the invalid part while normally allowing severability, does not conclusively dictate it. The final determination depends on *whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable. . . ."* ' " (*Gerken v. Fair Political Practices Com.* (1993) 6 Cal.4th 707, 714; see also *Santa Barbara Sch. Dist. v. Superior Court* (1975) 13 Cal.3d 315, 330-331.)

The three criteria for severability are that the invalid provision must be grammatically, functionally and volitionally separable. (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821.) To be grammatically separable, the valid and invalid parts

---

[11] Section 16 provides: "This Act shall be interpreted and applied so as to be consistent with all federal, state, and local laws, rules, and regulations, including the Local Coastal Program. If any provision of this Act or part thereof, or any application thereof, is for any reason held to be invalid or unconstitutional, the remaining sections and applications shall not be affected but shall remain in full force and effect, and to this end, the provisions of this Act are severable."

can be separated by paragraph, sentence, clause, phrase or single words.  (*People's Advocate, Inc. v. Superior Court* (1986) 181 Cal.App.3d 316, 330.)  Functional severability refers to whether the surviving sections are capable of independent application. Volitional severability refers to whether the voters would have adopted the initiative without the invalid provisions.  (*Pala Band of Mission Indians v. Board of Supervisors*, *supra*, 54 Cal.App.4th at p. 586.)  In other words, would the voters have been happy to achieve at least some of the substantial portion of their purpose? (*Santa Barbara Sch. Dist. v. Superior Court*, *supra*, 13 Cal.3d at pp. 331-332.)

> A.　　*Severability of the voter approval requirement*

The City proposes to sever Measure R's voter approval requirements.  This proposal does not address or cure the infirmities in Measure R we identified; namely, the requirement of a specific plan itself.

In any event, the voter approval requirement is not, at a minimum, volitionally severable.  The test of whether an invalid provision is volitionally severable has been characterized as follows:  " '[T]he provisions to be severed must be so presented to the electorate in the initiative that their significance may be seen and independently evaluated in the light of the assigned purposes of the enactment.  The test is whether it can be said with confidence that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have been separately considered and adopted them in the absence of the invalid portions.' "  (*Gerken v. Fair Political Practices Com.*, *supra*, 6 Cal.4th at pp. 714-715, italics omitted.)  Here, the raison d'être of requiring a specific plan is to allow voters to reject or approve it.  That voter approval is an inextricable part of

21

Measure R is evident.  The measure's title is "*Your* Malibu, *Your Decision* Initiative."  (Italics added.)  One finding is, "Malibu *voters should have a voice* in long-term planning and in deciding whether large development projects that would radically alter the character of our community should proceed." (Preamble, *supra*, § 2, italics added.)  The measure's purpose and intent is to ensure "planning by requiring preparation and *voter approval* of specific plans for large commercial or mixed-use projects." (*Id.*, § 3, italics added.)  Newly added section 17.02.045 to Malibu's Municipal Code is entitled, "*The Right to Vote on Specific Plans* for Specified Commercial and Mixed-Use Projects." (Italics added.)  We therefore fail to see that Malibu voters would have been happy with Measure R in the absence of the voter approval provisions.

B.     *Severability of the CUP provisions*

As to the CUP provisions, the City proposes to interlineate the following italicized phrase from section 17.66.130, subdivision (D):  "To assure continued compliance with the provisions of this Section, each approved conditional use permit shall *run solely with the operation of the formula retail establishment for which it was approved and* continue to be valid upon change of ownership of the formula retail establishment, the land, or any lawfully existing building or structure on the land." (§ 17.66.130, subd. (D), italics added.)  This interlineation, at best, might address the problem that the CUP doesn't run with the land.

But it doesn't address the establishment-specific problem. Issuance of the CUP still depends on the applicant and not on the use of the land.  (See, e.g., § 17.66.130, subd. (B).)  The City admits as much when it emphasizes in its briefs that the CUP focuses on the applicant to ensure "a permitted ratio of chain

22

stores and avoid[ ] the AnyMall, USA effect." Accomplishing this requires a "thorough examination of a *business*." (Italics added.) This admission underscores the problems with the CUP provisions and severability. Measure R was designed to control not just chain stores in general but which *specific* chain stores may be in the community. The interveners are quite clear that the establishment-specific provisions are necessary to ensure, for example, there are not two Starbucks in the area.[12] Their clarity on this point undermines their suggestion that Measure R's CUP can be saved by applying it to chains dedicated to the same use. That is, a chain coffee shop could transfer the CUP to a different chain coffee shop, e.g., Starbucks to Peet's. But this still bases the CUP on the nature of the applicant *as a chain* rather than on the use that chain will make of the property. This, it seems to us, is contrary to principles governing CUPs in California.

---

[12]    The interveners say: "[I]f the City is unable to consider the identity of the particular restaurant or retail shop seeking a CUP in a particular neighborhood, it will be unable to ensure a diverse group of businesses exist to meet the needs of residents and visitors. . . . [¶] . . . A Peet's and a Starbuck's may be similar from the perspective of a person who wants a cup of coffee, but they can be quite different from the perspective of a City that already has one (or more) Starbucks and wishes to preserve the small-town character of its City by avoiding 'a predominant sense of familiarity or sameness' in its commercial base."

## DISPOSITION

The judgment is affirmed. Intervener-appellants' request for judicial notice is denied. Respondents shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**


ALDRICH, J.


We concur:


EDMON, P. J.


LAVIN, J.

24