Filed 3/15/24 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIRST APPELLATE DISTRICT**

**DIVISION FIVE**

| | |
|---|---|
| MOVE EDEN HOUSING et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF LIVERMORE et al., <br><br>     Defendants and Respondents; <br><br> EDEN HOUSING, INC., <br><br>     Real Party in Interest and Respondent. | A167346 <br> (Alameda County <br> Super. Ct. No. 22CV015399) <br><br> **ORDER MODIFYING OPINION AND DENYING REHEARING** <br> **[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Respondents' March 14, 2024, petition for rehearing is denied. It is ordered that this court's opinion filed on March 6, 2024, is modified as follows:

1. On page 29, the disposition is now modified to read:

The judgment is reversed and the case is remanded to the superior court with directions to issue a peremptory writ of mandate ordering respondents to process the referendum petition as required by the Elections Code. The superior court's order requiring plaintiffs to file an undertaking under Code of Civil Procedure section 529.2 is also reversed. Costs on appeal are awarded to plaintiffs/appellants.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part V.

The modification effects no change in the judgment.



SIMONS, J.


WE CONCUR:

JACKSON, P. J.
CHOU, J.


*Move Eden Housing et al. v. City of Livermore et al.* (A167346)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| MOVE EDEN HOUSING et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>CITY OF LIVERMORE et al.,<br><br>    Defendants and Respondents;<br><br>EDEN HOUSING, INC.,<br><br>    Real Party in Interest and<br>Respondent. | A167346<br><br>(Alameda County<br>Super. Ct. No. 22CV015399) |

Plaintiffs and appellants Move Eden Housing (Move Eden), Richard Ryon, and Thomas Ramos (jointly, plaintiffs) appeal the superior court's denial of their petition for a writ of mandate requiring respondents City of Livermore (City) and Livermore City Clerk Marie Weber (City Clerk) (jointly, respondents) to process plaintiffs' referendum petition in accordance with the Elections Code. The proposed referendum challenges a City Council resolution approving a development agreement between the City and real party in interest Eden Housing, Inc. (Eden Housing) for development of housing in downtown Livermore.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication except for part V.

The referendum petition presented to the City Clerk contained more than the minimum number of signatures required by the Election Code, but, on advice from the City Attorney, the City Clerk refused to take further action on the petition.  The City took the position that the proposed referendum would be invalid because the challenged resolution was an administrative act.  The superior court agreed and denied the writ petition.

We reverse.  Adoption of the challenged resolution was a legislative act subject to the referendum power, because the development agreement at issue approved the construction of and improvements to a new public park.[1]  We also conclude that, in approving the development agreement, the City did not act as an administrative agent for the State of California under the statutes dissolving California's redevelopment agencies, enacted starting in 2011.  We direct the superior court to order respondents to process the referendum petition as required by the Elections Code.  We also reverse the court's order requiring plaintiffs to file an undertaking under Code of Civil Procedure section 529.2 as a security for costs and damages due to the action.

BACKGROUND

The present appeal involves a proposed residential development and new public park in downtown Livermore (the Project), at the location of a former supermarket, in an area bounded by Railroad Avenue, Livermore Avenue, First Street, and L Street (the Property).  (See *Save Livermore Downtown v. City of Livermore* (2022) 87 Cal.App.5th 1116, 1122 (*Save Livermore Downtown*) [describing the Project in a proceeding challenging the City's compliance with environmental and zoning laws].)

---

[1] In a portion of the opinion not certified for publication, we conclude the City did not act legislatively in approving loan terms and an indemnity provision relating to hazardous waste.

2

In 2008, the City's former Redevelopment Agency acquired the Property using the City's inclusionary housing funds, and, in 2009, a portion of the purchase price was refinanced using "Residential Development Loan Program" funds from the State of California. The funds were awarded to the City for "site acquisition and pre-development expenses" in the City's downtown. The City loaned the funds to the former Redevelopment Agency, and a deed restriction was recorded requiring any development of the Property to include "at least" 28 units of "low-income" housing and 56 units of "moderate-income" housing. The restriction was "a condition of accepting" the development funds from the State. When the State of California dissolved the Redevelopment Agency (see Part IV.A., *post*), the Property was included in a long range property management plan (Long Range Plan), which the State approved. The Long Range Plan identified the Property as a housing asset to be transferred to the City as the successor to the former redevelopment agency; it specified that the "goal" is to develop the Property "as a high density residential project with an affordable component and repay the $5,000,000 State" redevelopment loan.

In 2018, the City and Eden Housing entered into a Disposition and Development and Loan Agreement for development of the Property (2018 Agreement). The 2018 Agreement recited that, in January, the City Council "approved the development of the Livermore Village Site[2] to include a public park, up to 130 units of workforce housing, a science center, a black box theater, and retail space." The City selected Eden Housing to develop housing at the Property, and the agreement states a portion of the Property "will be dedicated to the City for a park." The City agreed to sell the Property to Eden Housing, after satisfaction of various conditions, for the Property's

---

[2] The Livermore Village Site is a larger area that includes the Property.

3

fair market value at the time of sale and to make "a future acquisition loan to [Eden Housing] in the amount of the Purchase Price of the Property." The term of the loan would be 55 years, at either "3% annual simple interest" or "the long-term applicable federal rate for annual compounding published by the Internal Revenue Service," with the City and Eden Housing agreeing "upon the Site Acquisition Loan's applicable interest prior to Site acquisition, based on the Project's overall financial feasibility and Investor requirements." The 2018 Agreement also stated that Eden Housing "and City shall enter into an indemnity agreement to apportion any potential liability related to Hazardous Materials at, on, in, beneath, or from the Property from and after the date of the close of escrow between the Parties. The form of the indemnity agreement shall be mutually agreed upon by the Parties."

In December 2020, the City reviewed "Conceptual Plans" and "instructed staff to move forward" (capitalization omitted) with the Project. In May 2021, the City approved land use entitlements for the Project, subject to conditions. That same month, the City approved an amended development agreement (2021 Agreement). The approval resolution and the 2021 Agreement recited that the City and Eden Housing "wish to amend the [2018 Agreement] to clarify the definition of the Property subject to transfer by City for development of the Project, define development and financial obligations for Veteran's Park, allow for reimbursement by City to Developer for certain emergency vehicle access road improvements adjacent to the Project, and to update the entitlement, financing and development timeline in the Schedule of Development." With respect to the park, the 2021 Agreement stated, "[a]t City's option, City and Developer may negotiate a future construction and reimbursement agreement with Developer to coordinate the construction of

4

the Veteran's Park Improvements.  These improvements would be exclusive of any development loan provided by the City for development of the Project."

In June 2021, a group known as Save Livermore Downtown filed a petition for a writ of mandate alleging that the City violated the California Environmental Quality Act (CEQA) and state and local planning and zoning laws in approving the Project.  The trial court denied the petition and this court affirmed.  (*Save Livermore Downtown*, *supra*, 87 Cal.App.5th 1116.)

On May 24, 2022, the City adopted Resolution No. 2022-085 (the Resolution), which is the subject of the present action.  The Resolution authorized the execution of an "Amended and Restated Disposition, Development and Loan Agreement" for the Project (2022 Agreement).  The 2022 Agreement states that it supersedes the original 2018 Agreement, as amended in 2021.  Among other provisions, the 2022 Agreement requires the City to make a loan to Eden Housing for the purchase price of the Property ($7.8 million), at an interest rate of 3 percent and payable over 55 years.  The 2022 Agreement also reflects the City's decision to spend $5.5 million on constructing and improving Veteran's Park as part of the Project.  In particular, the agreement provides, "The Parties agree that the Developer will manage the construction of the Veteran's Park Improvements but that the City will pay for the costs of the Veteran's Park Improvements at its sole expense.  City and Developer will negotiate a future construction management and reimbursement agreement to coordinate the construction of the Veteran's Park Improvements.  The Agreement shall authorize reimbursement for the construction of the park, per the designs and specifications issued by the City, and shall not exceed [$5.5 million] . . . without additional approval of the City Council."  Finally, to address historic subsurface contamination of the Property, the 2022 Agreement requires the

5

City and Eden Housing to enter into an indemnity agreement "to apportion costs and potential liability related to Hazardous Materials" at the Project site, with the City's obligation not to exceed $4.3 million.

On May 27, 2022, counsel for plaintiff and appellant Richard Ryon provided the City Clerk with a proposed summary of the Resolution for the purpose of a proposed referendum on the Resolution. On June 3, plaintiff and appellant Move Eden was formed to, among other things, promote the qualification of the proposed referendum. On June 9, the City Attorney approved a summary for purposes of the proposed referendum. Move Eden then sought to obtain the statutorily required number of signatures from registered voters to qualify the referendum for the November 2022 ballot. On July 8, the referendum proponents submitted the referendum petition to the City Clerk with more than the required number of signatures.

On July 13, 2022, the City Clerk sent a letter to plaintiff and appellant Ryon stating that she "took in the petition . . . for the purpose of making the *prima facie* count of signatures to determine whether the total number of signatures equals or is in excess of the minimum number of signatures required, which is 5,702," citing Elections Code section 9210.[3] A prima facie signature count was prepared, counting 9,737 total signatures and noting it was "not a determination that signatures are valid." However, rather than accepting the petition for filing and determining the validity of the signatures pursuant to statutory requirements (see Part II, *post*), the City Clerk's letter stated that, "[b]ased on the advice from the City Attorney and special counsel, . . . the City has determined that Resolution No. 2022-085 was an administrative act, not a legislative act, and not subject to referendum." On that basis, the City Clerk stated that the petition is "not eligible for filing or

---

[3] All undesignated section references are to the Elections Code.

processing as a referendum" and "the City is taking no further action on this petition."

In August 2022, plaintiffs commenced the present action by filing a petition for writ of mandate (Petition) seeking to compel the City and the City Clerk to process the referendum petition in accordance with the Elections Code.

In September 2022, Eden Housing filed a motion for a bond pursuant to Code of Civil Procedure section 529.2. In October, the superior court granted the motion, directing plaintiffs to file an undertaking in the amount of $500,000 as security for costs and damages due to the action.

In January 2023, the superior court denied the Petition on the merits. The court concluded the Resolution was not subject to challenge by referendum because it was an administrative act or, in the alternative, because the City acted as an administrative agent of the State in adopting it. The court concluded that either it was lawful for the City Clerk to refuse to process the referendum petition, or it is proper to " 'retroactively validate[]' " the conclusion that the proposed referendum is invalid, even if the City Clerk violated the law. The superior court denied the Petition, and the present appeal followed.

DISCUSSION

I.     *Standard of Review*

A traditional writ of mandate under Code of Civil Procedure section 1085 " 'is used to compel a public entity to perform a legal and usually ministerial duty.' " (*Schmid v. City & County of San Francisco* (2021) 60 Cal.App.5th 470, 484–485.) " 'On appeal following a trial court's decision on a petition for a writ of mandate, the reviewing court " 'need only review the record to determine whether the trial court's findings are supported by

7

substantial evidence.' " [Citation.]  However, we review questions of law independently.  [Citation.]  Where, as here, the facts are undisputed and the issue involves statutory interpretation, we exercise our independent judgment and review the matter de novo.  [Citation.]'  [Citations.] [¶] The trial court's determination that [respondents'] actions did not violate the Elections Code is a legal finding subject to independent review." (*Lindelli v. Town of San Anselmo* (2003) 111 Cal.App.4th 1099, 1104 (*Lindelli*).)

II.      *Referendum Process and Judicial Review*

"Under the California Constitution, '[t]he legislative power of this State is vested in the California Legislature . . . but the people reserve to themselves the powers of initiative and referendum.' (Cal. Const., art. IV, § 1.) . . . The initiative power allows voters to propose new measures and place them on the ballot for a popular vote.  If the measure is approved by popular vote, it becomes law. (Cal. Const., art. II, §§ 8, 10, subd. (a).)  The referendum power, by contrast, allows voters to weigh in on laws that have already been passed by their elected representatives.  Any voter or group of voters that gathers enough signatures can place a legislative enactment on the ballot for an up or down vote.  A referendum suspends operation of the law until it is approved by a majority of voters." (*Wilde v. City of Dunsmuir* (2020) 9 Cal.5th 1105, 1111.)

"Under [] section 9237, if a petition protesting the adoption of an ordinance is signed by more than 10 percent of the voters of the city, 'the effective date of the ordinance shall be suspended and the legislative body shall reconsider the ordinance.'  If the legislative body does not repeal the ordinance, then it 'shall submit the ordinance to the voters' and '[t]he ordinance shall not become effective until a majority of the voters voting on the ordinance vote in favor of it.' ([]§ 9241.)  Local governments are not

8

empowered to exercise discretion in determining whether a duly certified referendum is placed on the ballot. [Citations.] If the local government believes an initiative or referendum is unlawful and should not be presented to voters, it should file a petition for a writ of mandate seeking to remove it from the ballot." (*Save Lafayette v. City of Lafayette* (2018) 20 Cal.App.5th 657, 663 (*Save Lafayette*); see also *Friends of Bay Meadows v. City of San Mateo* (2007) 157 Cal.App.4th 1175, 1185–1186 (*Bay Meadows*).)[4]

Although the law is clear that local governments are not permitted to refuse to process a referendum due to concerns about its validity, "[i]n practice, and in the interest of equity and judicial economy, courts have allowed local governments to assert such invalidity as a 'defense' in the original writ proceeding. [Citation.] But in doing so, neither courts nor litigants should lose sight of the fact that the burden of establishing this 'defense' falls squarely on the entity or person asserting the" referendum's invalidity. (*Save Stanislaus*, *supra*, 13 Cal.App.4th at p. 150.) The standard for such "preelection review" of a referendum "is one of great deference where

---

[4] Courts have not distinguished between referendums and initiatives with respect to the ministerial duty to act in accordance with the Elections Code in processing referendum and initiative petitions. (See *Save Stanislaus Area Farm Econ. v. Bd. of Supervisors* (1993) 13 Cal.App.4th 141, 152, fn. 3 (*Save Stanislaus*) ["There is no textual basis for construing the power of referendum as broader than the initiative power, or vice versa."]; see also, e.g., *Yost v. Thomas* (1984) 36 Cal.3d 561, 564, fn. 2 (*Yost*) [substituting word "referendum" for "initiative" in quoting prior case on issue of clerk's duty to process referendum]; *Save Lafayette*, *supra*, 20 Cal.App.5th at pp. 663–664 [relying on both initiative and referendum caselaw on the topic].) Respondents cite no authority to the contrary.

We also observe that, "it is well established that any legislative act may be enacted by initiative and may be subject to referendum, regardless of whether that act is denominated an 'ordinance' or 'resolution.' " (*DeVita v. Cnty. of Napa* (1995) 9 Cal.4th 763, 787, fn. 9 (*DeVita*).)

'a court will remove an initiative [or referendum] from the ballot only "on a compelling showing that a proper case has been established for interfering." ' [Citation.]  If a city refuses to place a referendum on the ballot, 'this refusal—improper as it is—may be retroactively validated by a judicial declaration that the measure should not be submitted to the voters.' " (*Save Lafayette*, *supra*, 20 Cal.App.5th at pp. 663–664.)

"The Constitution 'speaks of the initiative and referendum, not as a right granted the people, but as a power reserved by them.' [Citation.]  Since then, courts have consistently declared it their duty to ' "jealously guard" ' and liberally construe the right so that it ' "be not improperly annulled." ' [Citation.]  Moreover, when weighing the tradeoffs associated with the initiative [or referendum] power, we have acknowledged the obligation to resolve doubts in favor of the exercise of the right whenever possible." (*California Cannabis Coal. v. City of Upland* (2017) 3 Cal.5th 924, 934; see also *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 (*Associated Home Builders*).)

Respondents appear to argue the City Clerk's action was *not* unlawful because the superior court subsequently agreed the proposed referendum was invalid.  They are mistaken.  An election official may not "refuse to submit an initiative [or referendum] measure to the electorate on the ground that it deals with a matter not subject to the initiative [or referendum]." (*Farley v. Healey* (1967) 67 Cal.2d 325, 327; accord *Yost, supra*, 36 Cal.3d at p. 564, fn. 2 [following *Farley* in referendum context]; see also *Bay Meadows, supra*, 157 Cal.App.4th at p. 1187 ["The role of the election official is meant to be as impersonal as possible.  There is to be no concern with whether a referendum 'will be valid if enacted.' "].)  Rather, "In certifying a referendum petition, a clerk's duty is limited to the ministerial function of determining whether the

10

procedural requirements have been met." (*Lin v. City of Pleasanton* (2009) 175 Cal.App.4th 1143, 1155 (2009).) The case respondents rely upon, *Am. Fed'n of Lab. v. Eu* (1984) 36 Cal.3d 687, is not to the contrary. That case did not involve a local government's refusal to process a petition; instead, opponents of an initiative filed an action to prevent it from appearing on the ballot. (*Id.* at p. 694.)

In the present case, the City Clerk made a determination "that the number of signatures, prima facie, equals or is in excess of the minimum number of signatures required." (§ 9210, subd. (b).) In these circumstances, the law directs that the clerk "shall accept the petition for filing" (§ 9210, subd. (b)) and then "shall examine the petition and certify the results" pursuant to statutory procedures (§ 9240).[5] "The word 'shall' indicates a mandatory or ministerial duty." (*Lazan v. Cnty. of Riverside* (2006) 140 Cal.App.4th 453, 460.) But, instead of complying with her statutory obligations, the City Clerk refused to process the referendum petition based

---

[5] Section 9210 provides in relevant part, "When the petition is presented for filing, the elections official shall do all of the following: [¶] (a) Ascertain the number of registered voters of the city last reported by the county elections official to the Secretary of State pursuant to Section 2187 effective at the time the notice specified in Section 9202 was published. [¶] (b) Determine the total number of signatures affixed to the petition. If, from this examination, the elections official determines that the number of signatures, prima facie, equals or is in excess of the minimum number of signatures required, he or she shall accept the petition for filing." Section 9240 provides, "After the petition has been filed as herein provided, the elections official shall examine the petition and certify the results in the same manner as are county petitions in Sections 9114 and 9115 except that, for the purposes of this section, references to the board of supervisors shall be treated as references to the legislative body of the city." Sections 9114 and 9115 detail procedures for validation of signatures on a petition. If "the petition is found to be sufficient, the elections official shall certify the results of the examination to the [city council]." (§§ 9114, 9115, subd. (f).)

11

on legal advice that the Resolution was not subject to the referendum power. In doing so, the City Clerk violated her duties under the Elections Code. " 'Improper as' " the clerk's conduct was, we nevertheless proceed to the question of whether the City has made a " ' "compelling showing" ' " that the proposed referendum " 'should not be submitted to the voters.' " (*Save Lafayette*, *supra*, 20 Cal.App.5th at pp. 663–664).

III.    *Due to The Policy Decision to Construct and Improve Veteran's Park, Adoption of The Resolution Was a Legislative Act*

"Courts have long observed that '[t]he power of referendum applies only to acts that are legislative in character; executive or administrative acts are not within the scope of that remedy.' . . . 'This legislative-administrative dichotomy reflects a determination to balance the ideal of direct legislation by the people against the practical necessity of freeing municipal governments from time consuming and costly referenda on merely administrative matters.' " (*San Bruno Comm. for Econ. Just. v. City of San Bruno* (2017) 15 Cal.App.5th 524, 530 (*San Bruno*); see also *Yost*, *supra*, 36 Cal.3d at p. 569 ["The powers of referendum and initiative apply only to legislative acts by a local governing body."].)

"Although the test is not precise and the published decisions reflect some inconsistency in approach, '[l]egislative acts generally are those which declare a public purpose and make provisions for the ways and means of its accomplishment.  Administrative acts, on the other hand, are those which are necessary to carry out the legislative policies and purposes already declared by the legislative body.' [Citation.]  Alternatively stated, ' "[t]he power to be exercised is legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it." '

12

[Citation.] 'The plausible rationale for this rule espoused in numerous cases is that to allow the referendum or initiative to be invoked to annul or delay the executive or administrative conduct would destroy the efficient administration of the business affairs of a city or municipality.' " (*San Bruno, supra*, 15 Cal.App.5th at p. 530 [italics omitted].)

The Supreme Court's decision in *Hopping v. Council of Richmond* (1915) 170 Cal. 605 (*Hopping*), is instructive. In *Hopping*, the issue was whether city council resolutions providing "for the acquisition . . . of certain tracts of land and the construction of a building thereon for a city hall and city offices" were legislative and subject to referendum. (*Id.* at p. 607.) The Supreme Court concluded the challenged resolutions were legislative because "[t]hey involved and required a determination by the council that the public interest of the city required that it should have a city hall, that the same should be located on the land offered for that purpose, that said offer should be accepted, that a suitable building should be erected thereon, that the money of the city should be appropriated and used in the construction thereof, and that, when completed, the building should be occupied and used by the city officers as a city hall and for municipal purposes . . . ." (*Id.* at pp. 614–615; see also *Citizens Against a New Jail v. Bd. of Supervisors* (1976) 63 Cal.App.3d 559, 563 ["factors of cost and practicality" make decision to build new jail or renovate old jail legislative]; *Duran v. Cassidy* (1972) 28 Cal.App.3d 574, 581 [whether to invest public funds in a municipal golf course is a legislative policy decision]; *Reagan v. City of Sausalito* (1962) 210 Cal.App.2d 618, 624, 628 (*Reagan*) [decision to purchase property is a legislative act]; *Knowlton v. Hezmalhalch* (1939) 32 Cal.App.2d 419, 435 [determination to construct city hall and appropriation of funds therefor were legislative acts]; *Burdick v. City of San Diego* (1938) 29 Cal.App.2d 565, 569

13

(*Burdick*) [determination to construct police station and appropriation of funds therefor were legislative acts].)

The 2022 Agreement, for the first time, authorizes the construction of and improvements to Veteran's Park. Respondents argue the City had "already approved a future negotiation" regarding construction of Veteran's Park, but we observe that the 2021 Agreement only states the City in its "sole discretion" has the "option" to negotiate an agreement to fund construction of the park and improvements. At oral argument, respondents argued only that the 2021 Agreement "put[] the *possibility* on the table." (Italics added.) Thus, the record demonstrates that the Resolution approving the 2022 Agreement was the initial relevant policy determination regarding the park's construction and improvements. Contrary to respondents' suggestion, with respect to the park, the Resolution did not involve *merely* the City's determination to appropriate specific amounts of public funds for a plan that had already been adopted.

*Burdick* informs this analysis. There, the City of San Diego decided to erect a police station at a designated site and, in a series of acts, developed plans for the facility and appropriated funds for the project. (*Burdick, supra*, 29 Cal.App.2d at pp. 566–568.) Subsequently, the city council approved a resolution authorizing a call for construction bids. (*Id.* at pp. 568–569.) The court of appeal held that the *final* resolution was *not* subject to referendum, explaining, "Prior to the passage of [the resolution], the site for the police station had been designated and accepted. The city council had decided to erect the structure on that site. Money for the work had been appropriated and was available. The plans for the building had been approved and remained unchanged. The specifications and form of the contract had been approved. The three earlier acts were legislative in character and fixed the

14

policy of the City of San Diego to erect the police station on the designated site." (*Id.* at p. 569.) In the present case, the challenged Resolution is not analogous to the final resolution at issue in *Burdick*; instead, in approving the construction and improvement of Veteran's Park, the Resolution corresponds to the *prior* legislative approval of construction of a police station.

The trial court relied on *San Bruno, supra*, 15 Cal.App.5th 524, in deciding adoption of the Resolution was an administrative act. In *San Bruno*, the Court of Appeal concluded a resolution approving the sale of property to a hotel developer was not a legislative act subject to a referendum. (*Id.* at p. 528.) The *San Bruno* court distinguished *Hopping* in language that undermines respondents' position: "In the present case, the City is not acquiring land for any municipal purpose, and is not appropriating any of its own funds in connection with the real estate transaction. Instead, the City is selling land to a private developer for a profit, and is not providing any subsidy to the developer." (*San Bruno*, at p. 531.) In contrast, the Resolution at issue here involves a public policy determination to construct and improve Veteran's Park at the public's expense. (*Hopping, supra*, 170 Cal. at pp. 613–614.)

*San Bruno* also concluded the contract to sell land in that case was an administrative act because "the primary substantive decisions pertaining to the proposed development [had] already been made." (*San Bruno, supra*, 15 Cal.App.5th at p. 536.) In the present case, although the "primary substantive decisions" relating to the housing aspects of the Project were made prior to the 2022 Agreement, the "primary substantive decisions" regarding Veteran's Park were only set out in the 2022 Agreement. (Cf. *id.* at p. 536 [noting that the resolution at issue in the case did "not include any

15

new action to further amend the Specific Plan, adopt new legislation, or otherwise take legislative action"].)  The City's decision to construct and improve Veteran's Park for $5.5 million was "political in nature" (*id.* at p. 534), and, in so deciding, the City "could consider the questions of public good, public interests, and public policy involved solely by virtue of and in the exercise of its legislative powers, and its action thereon was clearly an act in the exercise of that power."  (*Hopping*, *supra*, 170 Cal. at p. 615.)

IV.   *The City Was Not Acting as the State's Administrative Agent in Approving the Resolution*

The superior court also accepted respondents' argument that, even if the Resolution would typically be considered a legislative act, approval of the Resolution was, in the language of *Yost*, "administrative in nature by virtue of the fact that the council was acting under the authority delegated by the state to implement [the redevelopment dissolution process]—that, in effect, the [dissolution law] preempts the exercise of the power of referendum." (*Yost*, *supra*, 36 Cal.3d at p. 570.)  We reject that alternate basis to affirm.

A.   *Legal Principles and the Dissolution Law*

"Acts of a local governing body which, in a purely local context, would otherwise be legislative and subject to referendum may . . . become administrative 'in a situation in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state.' "  (*Yost*, *supra*, 36 Cal.3d at p. 570.)  Stated differently, acts are considered administrative where "the state has acted to establish the basic policy and has vested the responsibility for carrying out that policy" to a local governing body.  (*Simpson v. Hite* (1950) 36 Cal.2d 125, 130.)  Nevertheless, in light of the presumption in favor of the right to initiative and referendum, there must be a "definite indication

16

that the Legislature, as part of the exercise of its power to preempt all local legislation in matters of statewide concern, has intended to restrict that right." (*DeVita*, *supra*, 9 Cal.4th at p. 776; accord *City of Morgan Hill v. Bushey* (2018) 5 Cal.5th 1068, 1078–1079 (*Bushey*).)

"In the aftermath of World War II, the Legislature authorized the formation of community redevelopment agencies in order to remediate urban decay. [Citations.] The Community Redevelopment Law 'was intended to help local governments revitalize blighted communities.' " (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245–246 (*Matosantos*); see also *Marek v. Napa Cmty. Redevelopment Agency* (1988) 46 Cal.3d 1070, 1082 [the redevelopment law was intended to remove and prevent blight, to create jobs and low-to-moderate income housing, and to attract private investment].)

"[I]n the summer of 2011 the Legislature enacted legislation . . . that barred any new redevelopment agency obligations, and established procedures for the windup and dissolution of the obligations of the nearly 400 redevelopment agencies then existing." (*City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461, 1463.)[6] The move "reflected a state policy to curtail perceived abuses of the [redevelopment law] by which [redevelopment agencies] and their 'sponsor' entities (usually cities) . . . used an increasing

---

[6] The initial legislation was Assembly Bill No. 26 (2011-2012 1st Ex. Sess., ch. 5), which was upheld in *Matosantos* and went into effect on February 1, 2012. (*Matosantos*, *supra*, 53 Cal.4th at p. 275.) "The Legislature subsequently adopted additional legislation—Assembly Bill No. 1484 (2011-2012 Reg. Sess.), eff. June 27, 2012, Assembly Bill No. 471 (2013-2014 Reg. Sess.), eff. Feb. 18, 2014, and Senate Bill No. 107 (2015-2016 Reg. Sess.), eff. Sept. 22, 2015—to clarify or modify the dissolution and wind down process. [Citations.] Taken together, we shall refer to these laws as the 'Dissolution Law.' " (*City of Chula Vista v. Stephenshaw* (2023) 91 Cal.App.5th 352, 357 (*Stephenshaw*).)

17

share of local property taxes as 'tax increments' (increases in property tax attributable to [agency] projects) for their own benefit." (*City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 573; see also *Matosantos, supra*, 53 Cal.4th at p. 248 [explaining that the Legislature was particularly concerned that property tax revenues were shifted away from school districts]; *id.* at p. 247 [pointing out that, by 2011, redevelopment agencies received "12 percent of all property tax revenue in the state"]; *Stephenshaw, supra*, 91 Cal.App.5th at p. 357.)

Prior to dissolution, redevelopment agencies were usually "governed by the sponsoring community's own legislative body. [Citations.] An agency [was] authorized to 'prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas.' [Citation.] To carry out such redevelopment plans, agencies [could] acquire real property . . . and undertake certain improvements to other public facilities in the project area [citation]. While redevelopment agencies [] used their powers in a wide variety of ways, in one common type of project the redevelopment agency [bought] and [assembled] parcels of land, buil[t] or enhance[d] the site's infrastructure, and transfer[red] the land to private parties on favorable terms for residential and/or commercial development." (*Matosantos, supra*, 53 Cal.4th at p. 246.)

As explained in *Matosantos*, the redevelopment dissolution legislation "dissolves all redevelopment agencies [citation] and transfers control of redevelopment agency assets to successor agencies, which are contemplated to be the city or county that created the redevelopment agency [citations]. . . . [S]uccessor agencies [are required] to continue to make payments and perform existing obligations." (*Matosantos, supra*, 53 Cal.4th at p. 251; see

also Health and Saf. Code, § 34167; *Stephenshaw*, *supra*, 91 Cal.App.5th at pp. 357–358.)

As relevant in the present case, Health and Safety Code section 34191.5, subdivision (b) requires a successor agency to "prepare a long-range property management plan that addresses the disposition and use of the real properties of the former redevelopment agency" and submit the plan for approval by the Department of Finance and a local "oversight board" (*id.* at § 34179). The plan must inventory the former redevelopment agency properties with specified information and "[a]ddress the use or disposition of all of the properties in the trust." (*Id.* at § 34191.5, subd. (c).) A property may not be transferred "unless the long-range property management plan has been approved by the oversight board and the Department of Finance." (*Id.* at § 34191.5, subd. (c)(2)(C).) In reviewing such a plan, "[t]he department shall only consider whether the long-range property management plan makes a good faith effort to address the requirements set forth in subdivision (c)" (*id.* at § 34191.5, subd. (d)), requiring an inventory and proposed disposition of all properties. An approved plan "govern[s], and supersede[s] all other provisions relating to, the disposition and use of the real property assets of the former redevelopment agency." (*Id.* at § 34191.3, subd. (a).) Finally, the legislation specifies that "[a]ctions to implement the disposition of property pursuant to an approved long-range property management plan shall not require review by the department." (*Id.* at § 34191.5, subd. (f).)

B.    *Respondents' Authorities*

The City's Long Range Plan identified the Property as a housing asset to be transferred to the City with the "goal" of development of a "high density residential project with an affordable component." The Long Range Plan was approved by the Department of Finance.

19

Respondents assert that "Redevelopment Dissolution preempts local governments' legislative powers," but they do not clarify why that is so. Although the Dissolution Law required the City to inventory and describe the disposition of the former redevelopment agency properties, and although the approved Long Range Plan thereafter governed the disposition of the Property, respondents fail to explain how that rendered the City's decision to construct and improve Veteran's Park administrative. The Long Range Plan says nothing about the construction of a public park, and respondents are misplaced in arguing the City merely acted as an administrative agent of the State in making the policy decision to do so.

The cases respondents rely upon are distinguishable because they involve instances where "the local legislative body's discretion was largely preempted by statutory mandate." (*DeVita*, *supra*, 9 Cal.4th at p. 776.) Thus, in *Simpson v. Hite*, *supra*, 36 Cal.2d 125, 133–134, the court held that the initiative or referendum power could not be used to interfere with a board of supervisors' duty to provide suitable accommodations for courts. But, as explained in *Yost*, *supra*, 36 Cal.3d at p. 573, "the *only* discretion left to the local government by the Legislature in *Simpson* was the choice of a site for a municipal and superior court. The board of supervisors had a duty to provide suitable quarters for the courts. . ." (See also *Bushey*, *supra*, 5 Cal.5th at p. 1083 [distinguishing *Simpson* on same ground]; *Associated Home Builders*, *supra*, 18 Cal.3d at p. 596, fn. 14 [characterizing *Simpson* as a case "in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state"].) No analogous mandate constrained the City's discretion here.

Also distinguishable are cases arising in the context of the Housing Authorities Law, enacted "to take advantage of the federal loans provided by

20

the United States Housing Authority Act of 1937" and thereby provide for "low-rent, safe and sanitary dwellings" throughout the State. (*Kleiber v. San Francisco* (1941) 18 Cal.2d 718, 719, 723 (*Kleiber*).) The court in *Klieber* rejected a claim that certain contracts entered into pursuant to the Housing Authorities Law were void because they were legislative acts that under the San Francisco charter had to be accomplished by ordinance. (*Kleiber*, at p. 719.) The court concluded that the challenged resolutions were administrative, because "[t]he public purpose here involved was declared and made law by the legislature of this state . . . ." (*Id.* at p. 723.) Upon a local finding of necessity, the law provided for the operation of a local housing authority and "prescribed the powers, duties and obligations of the authority and of the city in carrying out its salutary purposes. Every necessary legislative act was completed by the legislature. There was nothing left to do except to administer the law." (*Id.* at pp. 720, 724.)

In *Hous. Auth. of City of Los Angeles v. City of Los Angeles* (1952) 38 Cal.2d 853 (*Housing Authority of L.A.*), the City of Los Angeles sought to avoid performance of its obligations under an agreement between the city and the local housing authority relating to a previously approved project. (*Id.* at pp. 856–857.) The Supreme Court concluded that the applicable state and federal laws did not permit "the city's attempted cancellation, abandonment and abrogation of its contracts." (*Id.* at p. 870.) Citing *Kleiber*, the court concluded that, "having taken the initial discretionary action to bring the housing authority into operation and having approved a project and entered into a cooperation agreement, there was nothing left to be done by either contracting party but to perform administratively whatever was necessary to carry the agreement into effect." (*Id.* at p. 862.)

21

A third housing authority case not cited by the parties is *Hous. Auth. of City of Eureka v. Superior Ct. of Humboldt Cnty.* (1950) 35 Cal.2d 550 (*Housing Authority of Eureka*). That case, unlike *Kleiber* and *Housing Authority of L.A.*, did involve the referendum power. There, citizens sought to challenge by referendum the local housing authority's application to the federal government for a loan of money to be used in the construction of low-rent public housing, approved by the city council. (*Id.* at pp. 552–555.) Citing *Kleiber*, the Supreme Court concluded that the city acted administratively in approving the loan application and, therefore, the resolution was not subject to the referendum power. (*Housing Authority of Eureka*, at pp. 558–559.)

The Supreme Court subsequently narrowly construed the *Housing Authority of Eureka* decision. *Bushey* characterized the decision as one "where state law mandates a certain result with no discretion or that involves an 'administrative' task." (*Bushey, supra*, 5 Cal.5th at p. 1083.) Similarly, the court in *DeVita, supra*, 9 Cal.4th at p. 776, characterized the *Housing Authority of Eureka* decision as involving an "area[] in which the local legislative body's discretion was largely preempted by statutory mandate." The present case is distinguishable. The redevelopment dissolution laws sought to free up real estate resources held by redevelopment agencies while still honoring prior commitments. (*Stephenshaw, supra*, 91 Cal.App.5th at pp. 357–358.) While the Long Range Plan specifies use of the Property as high density housing with an affordable component, in deciding to construct and improve Veteran's Park, the City made discretionary policy determinations that were not dictated by the Long Range Plan or any provision of the Dissolution Law. Accordingly, contrary to respondents' view, this is not a case where there is a " 'definite indication' or

22

a ' "clear showing" ' " the Legislature intended, in enacting the Dissolution Law, to "limit[] the local legislative body's discretion such that its task is 'administrative' rather than 'legislative.' " (*Bushey*, at p. 1079.)[7]

C.    *The* Yost *and* Bushey *Decisions*

*Yost*, *supra*, 36 Cal.3d 561, is instructive.  That case involved a petition for writ of mandate to compel a city clerk to process a referendum petition challenging a city council's authorization of a hotel and conference center on undeveloped coastal land pursuant to the city's local coastal plan approved by the Coastal Commission.  (*Id.* at pp. 565–566, 569.)  The Supreme Court held that the Coastal Act did not preempt local planning authority or the power of the voters to act through referendum.  (*Id.* at p. 565.)  Although the court recognized that "the Coastal Act is an attempt to deal with coastal land use on a statewide basis," the court observed that the act only "sets minimum standards and policies with which local governments within the coastal zone must comply; it does not mandate the action to be taken by a local government in implementing local land use controls."  (*Id.* at pp. 571–572.)  Because the law "leaves wide discretion to a local government not only to determine the contents of its land use plans, but to choose how to implement these plans," in making planning decisions "a city is acting legislatively and

---

[7] Although respondents do not cite to them, we observe that several cases have held that local decisions pursuant to the Community Redevelopment Law were beyond the reach of the referendum power.  (*Gibbs v. City of Napa* (1976) 59 Cal.App.3d 148, 154; see also *PR/JSM Rivara LLC v. Cmty. Redevelopment Agency* (2009) 180 Cal.App.4th 1475, 1482; *Walker v. City of Salinas* (1976) 56 Cal.App.3d 711, 718; *Andrews v. City of San Bernardino* (1959) 175 Cal.App.2d 459.)  But the City in this case did *not* act pursuant to the redevelopment law.  Instead, the present case involves the *Dissolution Law*.  As we have explained, the City was bound only by the very general specification in the Long Range Plan to build housing with an affordable component on the Property.

23

its actions are subject to the normal referendum procedure." (*Id.* at p. 573.) Similarly, the Dissolution Law and the approved Long Range Plan left wide discretion to the City in determining the content of the 2022 Agreement.[8]

*Bushey*, *supra*, 5 Cal.5th 1068, though not cited by the parties, is also instructive. In *Bushey*, a city filed a petition for writ of mandate contesting the validity of a referendum on a city rezoning ordinance in support of a hotel project. (*Id.* at pp. 1076–1077.) The Supreme Court held the ordinance was subject to challenge by referendum even though, if approved, the referendum would create a temporary inconsistency with the city's general plan. (*Id.* at pp. 1075–1076.) The court acknowledged that local zoning and general plans raise issues of " 'statewide concern' " and that the Legislature had mandated local governments to adopt general plans and required conformity between general plans and zoning ordinances. (*Id.* at p. 1079.) Nevertheless, the court concluded that the Legislature had *not* "preempted local electors' power to challenge by referendum a local government ordinance . . . aligning the relevant zoning designations with the amended general plan." (*Id.* at p. 1080.) Critically, the local government had *other* options to bring the general plan and zoning into conformity if the referendum passed. (*Id.* at pp. 1083, 1090–1091.) As the court explained, "Where the local government can still implement one of multiple approaches to achieve consistency between the zoning ordinance and the general plan while complying with [state law],

---

[8] Respondents argue *Yost* is distinguishable because section 30500, subdivision (c) of the Public Resources Code states, "The precise content of each local coastal program shall be determined by the local government, consistent with Section 30501, in full consultation with the commission . . . ." (See also *Yost*, *supra*, 36 Cal.3d at pp. 571–572.) However, even though the Dissolution Law does not contain a precisely analogous provision, respondents point to no provision denying cities a comparable level of discretion over local developments.

24

*the zoning ordinance is best understood as the product of a discretionary policy choice about the proper use of the land.*" (*Id.* at p. 1083 [emphasis added].) The same reasoning applies here. Although the 2022 Agreement is consistent with the Long Range Plan, it is not the *only* consistent approach. Because the City had many choices about *how* to develop the Property, its decision to construct and improve Veteran's Park as part of the Project was, as *Bushey* phrased it, "a discretionary policy choice about the proper use of the land." (*Ibid.*)

### D. *Conclusion*

Under respondents' view, the City acts as a mere administrative agent of the State in developing the Property as a "high density residential project with an affordable component," regardless of the discretionary decisions the City makes in doing so. Respondents are mistaken. Because there is no " 'definite indication' " (*Bushey*, *supra*, 5 Cal.5th at pp. 1078–1079) that the Legislature, in enacting the Dissolution Law, intended to preempt local discretionary policy decisions regarding municipal developments, the superior court erred in concluding the referendum power did not encompass the Resolution on the ground that the City was acting as an administrative agent of the State.

### V. *The City's Approvals of the Loan Terms and Indemnification Provision in the 2022 Agreement Did Not Render the Resolution Legislative*

Plaintiffs also contend the Resolution was legislative because, in the 2022 Agreement, the City (1) agreed to provide Eden Housing with a $7.8 million loan at 3 percent simple interest to be repaid over 55 years, and (2) agreed to bear up to $4.3 million in liability under an indemnification provision. At oral argument, both parties agreed that, moving forward, it would be helpful for this court to resolve those contentions.

25

As to the loan terms, the 2018 Agreement provided that, "The price of the property shall be equal to the appraised fair market value of the Property, and such appraisal shall be performed by an appraiser that is mutually agreed upon by the City and the Developer." That policy decision to sell the Property for fair market value was the relevant declaration of policy and "provision[] for the ways and means of its accomplishment," and the subsequent approval of the amount was an administrative act carrying out the previously determined "legislative policies and purposes." (*San Bruno*, *supra*, 15 Cal.App.5th at p. 530.) The same is true of the specification of 3 percent as the rate of interest. The 2018 Agreement provided that 3 percent was one of two potential interest rates, with the rate to be agreed upon "based on the Project's overall financial feasibility and Investor requirements." The ultimate determination that the Project finances supported selection of the 3 percent rate was an administrative determination pursuant to the policy established in the 2018 Agreement. Finally, the 55-year loan term was already specified in the 2018 Agreement. Accordingly, approval of the loan terms in the 2022 Agreement was not a legislative act.

The indemnification provision in the 2022 Agreement authorizes the City Manager "to negotiate and execute [an] indemnity and cooperation agreement in an amount not to exceed $4,300,000," in order to "apportion costs and any potential liability related to Hazardous Materials at, on, in, beneath, or from the Property . . ." At oral argument, plaintiffs conceded that, absent agreement from Eden Housing to assume a portion of the liability, the City would bear the liability. Plaintiffs further conceded that the effect of the 2022 Agreement was to cap the City's potential liability at $4.3 million, and that the cap benefitted taxpayers by limiting the City's

26

liability.  Finally, plaintiffs conceded that approval by the City of a stand-alone agreement identical to the indemnification provision would be an administrative act.  On appeal, plaintiffs, as appellants, bear the burden of showing the superior court erred.  (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 619.)  Given their concessions, they fail to do so.  They cite no authority that or reasoning why a municipality's decision to enter into a contract that potentially saves public funds by limiting liability is legislative, especially after the municipality has already approved a contract acknowledging its potential liability.  And they cite no authority that or reasoning why a determination that is otherwise administrative may be treated as legislative because the provision at issue is part of a larger agreement, the approval of which is legislative due to a wholly unrelated provision.  Accordingly, plaintiffs have not shown approval of the indemnification provision in the 2022 Agreement was a legislative act.[9]

VI.     *The Superior Court Erred in Requiring a Bond*

As noted previously, the superior court required plaintiffs to furnish an undertaking in the amount of $500,000 under Code of Civil Procedure section 529.2.  That statute provides that a defendant in a civil action "brought by any plaintiff to challenge a housing project which is a development project . . . and which meets or exceeds the requirements for low- or moderate-income

---

[9] At oral argument, respondents requested that this court direct the superior court to process the referendum only as to those parts of the 2022 Agreement that involved legislative determinations, citing *Dye v. Council of City of Compton*, 80 Cal.App.2d 486, 487.  But the issue in *Dye* was whether the referendum power permitted a challenge to only parts of a city ordinance.  (*Id.* at p. 488.)  The court did not suggest that, where a referendum petition challenges the whole of a resolution or ordinance, as in the present case, it would be proper to limit the scope of the referendum.  Given respondents' failure to present authority supporting their request, we decline it.

27

housing" may request an order requiring the plaintiff "to furnish an undertaking as security for costs and any damages that may be incurred by the defendant by the conclusion of the action or proceeding as the result of a delay in carrying out the development project." (Code Civ. Proc. § 529.2, subd. (a).) "The motion shall be made on the grounds that: (1) the action was brought in bad faith, vexatiously, for the purpose of delay, or to thwart the low- or moderate-income nature of the housing development project, and (2) the plaintiff will not suffer undue economic hardship by filing the undertaking." (*Ibid.*)

On appeal, plaintiffs contend the superior court erred in concluding the present action is within the scope of Code of Civil Procedure section 529.2. They argue the writ was brought "to enforce provisions of the Elections Code and secure for the City's voters their right to referendum" rather than to challenge the Project.

We agree. Although the *proposed referendum* challenges the Project and would have the effect of delaying the Project if it meets the statutory requirements, the present action is not itself a challenge to the Project. Instead, it is a challenge to the City Clerk's violation of the Elections Code. (Cf. *Save Livermore Downtown*, *supra*, 87 Cal.App.5th at p. 1123 [bond appropriate in action alleging "the project violated state and local planning and zoning laws" and CEQA].) It is revealing that, if the City Clerk had complied with her legal obligations and processed the referendum, then plaintiffs would not have had to file the present action. Instead, any challenge to the validity of the referendum could have been heard pursuant to a petition brought by the City. (*Save Lafayette*, *supra*, 20 Cal.App.5th at p. 663 ["If the local government believes an initiative or referendum is unlawful and should not be presented to voters, it should file a petition for a

28

writ of mandate seeking to remove it from the ballot."].)  In *those* circumstances, no colorable claim that plaintiffs were required to post a bond under Code of Civil Procedure section 529.2 would exist.  Requiring plaintiffs to file an undertaking in the present circumstances, in effect, rewards the City's chosen partner Eden Housing for the City's violation of clear and well-established law protecting the people's constitutional referendum power. (See Part II, *ante*.)

Real party in interest Eden Housing argues that, in challenging the City Clerk's refusal to process the referendum petition, plaintiffs' action "challenges a City determination that directly impacts the Project."  But Eden Housing proposes no plain language interpretation of Code of Civil Procedure section 529.2 that encompasses an action that does not directly challenge any aspect of a housing project.  At oral argument, Eden Housing attempted to analogize plaintiffs' action to enforce the referendum power to a CEQA action to enforce environmental protections.  But Code of Civil Procedure section 529.2 expressly states that CEQA actions are within the scope of the statute.  (Code Civ. Pro. § 529.2, subd. (a) [referencing "actions brought pursuant to Section 21167 of the Public Resources Code"].)

Because the present action does not come within the plain language of Code of Civil Procedure section 529.2, the superior court erred as a matter of law in requiring plaintiffs to file an undertaking under that statute.

## DISPOSITION

The judgment is reversed and the case is remanded to the superior court with directions to issue a peremptory writ of mandate ordering respondents to process the referendum petition and to place the proposed referendum on the ballot for municipal election, provided there has been compliance with the formal filing requirements.  The superior court's order

29

requiring plaintiffs to file an undertaking under Code of Civil Procedure section 529.2 is also reversed.  Costs on appeal are awarded to plaintiffs/appellants.



                                              SIMONS, J.

We concur.


JACKSON, P. J.
CHOU, J.




(A167346)


30

## Move Eden Housing, et al. v. City of Livermore, et al. (A167346)

Trial Judge:      Hon. Michael Markman

Trial Court:      Alameda County Superior Court

Attorneys:

      Latham & Watkins LLP, Winston P. Stromberg, Michelle Cornell-Davis, and Kevin A. Homrighausen for Plaintiffs and Appellants.

      Richards, Watson & Gershon, T. Peter Pierce and Steven A. Nguy; Jason Alcala and Kimberly D. Cilley, City Attorney, for Defendants and Respondents.

      Cox, Castle & Nicholson LLP, Andrew B. Sabey, Scott B. Birkey, Robbie C. Hull, for Real Party in Interest and Respondents.